[No. H034349. Sixth Dist. Apr. 29, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
DARIAN MANUEL POWELL, Defendant and Appellant.

COUNSEL

J. Frank McCabe, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and David M. Baskind, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DUFFY, J.**—A jury convicted defendant Darian Manuel Powell of raping his young daughter and exposing her to obscene pornographic movies. On appeal, he claims that the trial court improperly refused to let him represent himself at trial, incorrectly ruled that his daughter could testify against him via closed-circuit television, and made mistakes in deciding the length of his sentence. He also claims that the evidence the jury received was too weak to allow it to convict him of exposing his daughter to the pornographic movies.

We find no reason to reverse the judgment and will affirm it.

### PROCEDURAL BACKGROUND

A jury convicted defendant of unlawful sexual intercourse with a minor 10 years old or younger. (Pen. Code, § 288.7, subd. (a).)[1] It also convicted him of exhibiting harmful matter to a minor for purposes of seduction and sexual gratification. (§ 288.2, subd. (a).) Harmful matter, for purposes of section 288.2, essentially means obscene material as defined in *Miller v. California* (1973) 413 U.S. 15, 24–25 [37 L.Ed.2d 419, 93 S.Ct. 2607] (*Miller*), but with certain differences, including a gloss that the material must have no redeeming value within the meaning of *Miller* for the benefit of minors. (See § 313, subd. (a).)

Defendant also challenged his criminal liability on the ground that he was insane at the time of the crimes. A separate jury was impaneled to try this question after the first jury found him guilty. The jury found him to be sane.

The trial court sentenced defendant to 25 years to life imprisonment on the section 288.7 conviction consecutive to an aggravated three-year term on the section 288.2 conviction.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

## FACTS

### I. *Prosecution Case*

The victim is the daughter of defendant and L.H., and she was born in 1997. After defendant and L.H. ended their nonmarital relationship, custody arrangements caused the victim to have unsupervised visits with defendant from 10:00 a.m. to 6:00 p.m. every Sunday.

During some of these visits, and at a time when the victim was 10 years old or younger, defendant would rape her. He forced himself on her for purposes of sexual intercourse about 10 times—sometimes after or while watching pornographic movies.[2] She would tell him to desist and invariably would try to escape, but he would ignore her and sometimes would hold down her arms, which she thought he did to block her from escaping.

Another time—but this was uncharged conduct—defendant forced the victim to engage in oral copulation of him. She was 10 years old when this happened.

### II. *Defense Case*

Defendant presented no evidence, but defense counsel cross-examined prosecution witnesses.

## DISCUSSION

### I. *Self-representation Claim*

Defendant claims that the trial court erred in denying his motion to represent himself as untimely. We do not agree.

#### A. *Procedural Background*

On August 27, 2008, the trial court held a *Marsden* hearing, i.e., a hearing to consider defendant's request to replace his current counsel with new counsel, as authorized by *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*). The court denied the motion. Thereupon defendant declared that he wanted to make a *Faretta* motion, i.e., a motion to

---

[2] The nature and content of these movies are central to defendant's claims III through VI, i.e., those resting on his section 288.2, subdivision (a), conviction, and we provide a more detailed description of the evidence about them in part III., *post*, at pages 1284–1297.

represent himself as authorized by *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).

The trial court questioned defendant. He stated that he had represented himself at a previous trial to its completion. He was taking Geodon (ziprasidone), a drug used to treat schizophrenia and the manic phases of bipolar disorder, and Paxil (paroxetine hydrochloride), an antidepressant drug, because he was hearing voices and was depressed. He stated that the medications were ineffective—he was still hearing voices and his depression was severe. He further stated that he would not object if the court considered an evaluation by Brad Novak, M.D., a psychiatrist, written in connection with a prior competence hearing.

The trial court reviewed Dr. Novak's report. The court questioned defendant to ensure he understood the legal ramifications of representing himself, and defendant stated lucidly that he did. He acknowledged that he had been committed to mental health institutions three times for short-term evaluations, two of which followed suicide attempts.

Defendant continued. He asserted that he heard voices every day and was hearing them as he spoke. The voices told him what to do, including the manner of conducting his defense. The voices were advising him to represent himself.

The prosecutor argued that defendant's goal was to delay the proceedings. "[T]he medical reports indicate that he's malingering and that he's trying to avoid criminal responsibility and he's . . . laid a record for that this morning" by talking about what the prosecutor suspected were spurious auditory hallucinations. The prosecutor asked defendant, "if you were granted the status to represent yourself today, are you prepared to go forward with trial today?" Defendant responded, "No." The prosecutor reminded defendant and the trial court that this was the day trial was set to begin.

The trial court noted that a recent United States Supreme Court decision had announced separate standards for competence to stand trial and to represent oneself during the trial. (See *Indiana v. Edwards* (2008) 554 U.S. 164, 167, 174, 177–178 [171 L.Ed.2d 345, 128 S.Ct. 2379] [holding that the 6th Amend. permits states to require mentally impaired defendants to be tried represented by counsel when, though impaired, they are competent to stand trial].) The prosecutor commented that the court could deny the *Faretta* motion on the procedural ground that defendant was not prepared to proceed to trial that day.

The trial court ruled: "Mr. Powell, the Court denies your request for in pro[.] per[.] or self-representation status, based upon the fact that this is the

time and place for trial and that you're not capable of going forward at this time. [¶] Further, based upon your answers to my questions, even though Dr. Novak has made some findings, for purposes of the record, it's apparent to me that you are depressed, based upon what I'm observing. [¶] With respect to your mental issues, I'm not capable of responding to those at this particular point in time. I'm not qualified to do so. But the Court's of the opinion that . . . if the Court were to grant your in pro[.] per[.] status, you would need time to proceed, and that this matter has been set for trial at this time."

Trial did not begin that day, however. The trial court's attention was taken up with other important pretrial matters.

Immediately after the trial court denied defendant's *Faretta* motion, it held a hearing on the prosecutor's motion to have the victim testify via closed-circuit television. The hearing on the closed-circuit-testimony motion continued the next day, August 28, 2008, and still did not reach a resolution. The trial court ordered the hearing to continue on September 2, after an intervening weekend and the Labor Day holiday, when the courthouse would be closed. It appears that the hearing did resume on September 2; it may have continued on September 3, although the record is unclear on that point. The hearing concluded on September 8, after another intervening weekend. Jury selection began on September 10 and continued to the next day, when it concluded and the jury was sworn. The prosecution immediately began to present evidence.

### B. *Applicable Law*

■ "Criminal defendants have the right both to be represented by counsel at all critical stages of the prosecution and the right, based on the Sixth Amendment as interpreted in *Faretta, supra,* 422 U.S. 806, to represent themselves. [Citation.] However, this right of self-representation is not a license to abuse the dignity of the courtroom or disrupt the proceedings. [Citation.] *Faretta* motions must be both timely and unequivocal. . . . [Citations.] Equivocation of the right of self-representation may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation, or where such actions are the product of whim or frustration." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1001–1002 [47 Cal.Rptr.3d 467, 140 P.3d 775].) Moreover, a trial court rarely should grant such a motion on the day set for trial. Our Supreme Court has "held on numerous occasions that *Faretta* motions made on the eve of trial are untimely." (*People v. Lynch* (2010) 50 Cal.4th 693, 722 [114 Cal.Rptr.3d 63, 237 P.3d 416].) A motion made that close to the day set for trial is "extreme" (*id.* at p. 723) and now is disfavored (see *id.* at pp. 722–723

[collecting cases]; but see *People v. Windham* (1977) 19 Cal.3d 121, 126–128 & fn. 5 [137 Cal.Rptr. 8, 560 P.2d 1187] [a "showing of reasonable cause" made the day before trial may justify granting a *Faretta* motion and ordering a continuance].)

## C. *Analysis*

Because defendant's motion for self-representation was not "a timely, unequivocal *Faretta* motion" (*People v. Lawrence* (2009) 46 Cal.4th 186, 191 [92 Cal.Rptr.3d 613, 205 P.3d 1062]) in that it was made on the day set for trial, the trial court had discretion to decide to grant or deny it (*People v. Windham, supra*, 19 Cal.3d at p. 128, fn. 5 [when a defendant makes a *Faretta* motion the day before trial, granting or denying it rests within "the sound discretion of the trial court"]). Such discretion, it would seem in light of *People v. Lynch, supra*, 50 Cal.4th at pages 722–723, should seldom be exercised in favor of granting the motion, notwithstanding any contrary suggestion in the earlier *Windham* case. The trial court need not have elaborated on its ruling that defendant's motion could not be granted under such inopportune circumstances. A trial court abuses its discretion when its ruling falls outside the bounds of reason (*People v. Benavides* (2005) 35 Cal.4th 69, 88 [24 Cal.Rptr.3d 507, 105 P.3d 1099]) and we discern no such possibility that this occurred here. As we have noted, the proceedings continued immediately after the ruling, and ran without substantial interruption between the time of the ruling and the time the prosecution began to present its evidence to the jury. The court could reasonably believe that a continuance, which defendant would have needed insofar as he told the court and prosecutor that he was not ready to proceed to trial, would have impaired the orderly administration of justice. Defendant argues on appeal that the delay would not have done so. In his view, the court, the prosecution, and early witnesses would have been inconvenienced only minimally. The question before us, however, is not whether that is a possibility; instead, it is whether there was no contrary possibility, leaving the ruling without support. The record does not suggest that there was no possibility of these forms of inconvenience.

Of course, trial did not begin until some days after the *Marsden* and *Faretta* hearings of August 27, 2008. We notice, however, that the trial court's minute order for August 26 stated that August 27 at 8:30 a.m. was the date set for "motions/trial," meaning, in our view, that the court was contemplating the possibility of beginning trial that day. We presume that the court did not realize that the motion to permit the victim to testify via closed-circuit television would take as much time as it did, but we cannot fault it for its inability to predict the unknown, so it makes no difference to our analysis of its ruling.

Defendant asserts that his *Faretta* motion would have been timely except for circumstances beyond his control. He maintains that he submitted his *Marsden* motion on August 15 or 16, 2008, and that through no fault of his own the trial court neglected to attend to it until August 27, the day trial was set to begin and the day his *Faretta* motion was heard and denied. That, however, misinterprets the record. Defendant stated at the *Marsden* hearing that after experiencing misgivings about his attorney, "I wrote a [*Marsden*] letter to the Court, but I didn't have the Court's name or the judge's name, who to send it to. I have that here." The court stated, "It's a sealed letter, which I am opening at this time. [¶] It's dated August 16th." After the court read the letter into the record, defendant asked, "Should I give you this motion, the *Marsden* motion itself? . . . [¶] . . . [¶] I didn't date it or put the department number." The court took the motion, evidently looked at it quickly, and noted, "Most of the *Marsden* motion the defendant has given me is pro forma." The minutes for August 27 state, "The defendant provides the Court with his *Marsden* motion. The Court reviews the *Marsden* motion, orders it filed . . . ." Defendant did not transmit the letter and motion to the court on or about August 15 or 16. He handed them up during the hearing and cannot complain that the court neglected to consider what it had yet to receive.[3]

Defendant's *Faretta* claim thus is without merit. There was no violation of defendant's constitutional right to represent himself.

## II. *Permitting Victim to Testify via Closed-circuit Television*

Defendant contends that the trial court violated his right under the Sixth Amendment to the United States Constitution to confront the witnesses against him by permitting the prosecution to let the victim testify via two-way closed-circuit television from a location outside the courtroom without undertaking an adequate inquiry into how the victim would feel about testifying in his presence. He emphasizes that the court did not question the victim before ruling on this issue, but only heard testimony from individuals familiar with the victim and/or defendant.

The question arose because the victim, defendant's daughter, was 11 years old at the time of trial and had expressed unease about testifying against defendant in open court. The prosecution moved to let her testify via closed-circuit television as authorized by section 1347. Defendant opposed

---

[3] At oral argument, counsel for defendant asserted that defendant could not present his letter and motion to the court during that time period because trial counsel was on vacation. The record shows, however, that defense counsel was on vacation in the first two weeks of August, not the part of August relevant here. During the hearing, defendant himself stated that he met with counsel on August 18.

this request and accordingly, as noted in our discussion of defendant's *Faretta* claim, the trial court and parties devoted part or all of several days to the hearing on the motion.

## A. *Background Facts*

The section 1347 hearing produced testimony that at the preliminary examination on July 10, 2008, a jailer had seen defendant in a "very angry" state; he was "punching the walls inside his holding cell, his knuckles were bloody," and he told jailers "we would have to shoot him to shut him up." Later that day, defendant was cursing in the courtroom, and court personnel confined him in layers of restraints. A court bailiff testified about these incidents in the same vein. The victim was not present for the preliminary examination, but in confirming the foregoing accounts, San Jose Police Detective Gary Buhay testified at the section 1347 hearing that the victim told him she had not wanted to tell the school principal about the abuse because, it may be inferred from Buhay's testimony, she had been afraid that defendant would be angry. The victim's mother had seen defendant's outbursts during court proceedings and testified that the victim did not want to testify in defendant's presence, although further questioning by the court clarified that the victim's main fear might be the content of the testimony she would have to provide, not the setting in which she would have to provide it. Defendant was intimidating and manipulative and on one occasion had attacked his daughter, hitting her in the face. The mother felt that her daughter would suffer emotional distress, possibly of an extreme nature, if forced to testify in defendant's direct presence, unmediated by closed-circuit television.

A licensed clinical social worker employed as a therapist, including for families and children, testified that she conducted counseling sessions with the victim on five occasions, each about 45 or 50 minutes long. The victim was "resilient"; nevertheless, she confirmed that the victim was afraid to testify in open court. She might be capable of being physically present in court but might "shut down" and provide incomplete testimony. Defendant used to beat her with a belt[4] and she would find it difficult if he stared at her. "The idea of having her father stare at her would cause her to feel as if she would crumble. She said, 'like a piece of paper.' " The social worker was confident that the victim would suffer serious and severe emotional distress if forced to testify in the courtroom.

The trial court granted the prosecution's motion. It stated that "testifying in front of a jury would . . . cause the alleged victim serious emotional distress,

---

[4] The victim would later confirm this in her testimony.

to the extent that she might be unavailable as a witness." "The Court further finds by clear and convincing evidence with respect to [section 1347, subdivision] (b)(2), that [paragraphs] A and C [are satisfied] . . . . [']( A): Testimony by the minor in the presence of the defendant would result in the child suffering serious emotional distress so that the child would be unavailable as a witness.['] And, ['C]: The defendant threatened serious bodily injury to the child or [the] child's family,['] etc. The Court finds that there [were] threats of serious bodily injury. Again, these findings are made by clear and convincing evidence. [¶] Therefore, the alleged victim may testify by . . . closed-circuit TV."

Thereafter the victim testified during the trial via two-way closed-circuit television. As she testified, she was seated in a separate jury deliberation room in the courthouse. The monitor in that room transmitted a video feed showing defendant, defense counsel, and the prosecutor in the courtroom. The monitor was turned away from the victim, but she had the ability to orient it so she could view it if she wished.

### B. *Applicable Law*

■ "The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, [citation], provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' . . . [I]t guarantees a defendant's right to confront those 'who "bear testimony" ' against him." (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. ___, ___ [174 L.Ed.2d 314, 129 S.Ct. 2527, 2531].) The constitutional guaranty is not so absolute, however, that it always requires the accuser and accused to be in the same room. In *Maryland v. Craig* (1990) 497 U.S. 836 [111 L.Ed.2d 666, 110 S.Ct. 3157] (*Craig*), the United States Supreme Court held that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." (*Id.* at p. 853.)

*Craig, supra,* 497 U.S. 836, held that allowing closed-circuit testimony is to be determined on the facts before the trial court: "The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." (*Id.* at p. 855.) (The testimony here was via a system that transmitted two-way closed-circuit television images, but as noted, the victim chose not to watch the monitor in her separate room. In any event, we think that *Craig*'s general principles apply here.) The court concluded that the confrontation clause did not bar the use of a closed-circuit television procedure that, "despite the absence of face-to-face confrontation, ensures the

reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." (497 U.S. at p. 857; see § 1347, subds. (b)(3), (i) [examination must be under oath and equipment must accurately communicate the witness's image and demeanor].)[5]

In section 1347, the Legislature sought to make closed-circuit television testimony available to child witnesses under circumstances that, in the lawmakers' view, would preserve a defendant's Sixth Amendment confrontation rights as outlined in *Craig*. The statute provides in relevant part: "(b) Notwithstanding any other law, the court in any criminal proceeding . . . may order that the testimony of a minor 13 years of age or younger . . . be taken by contemporaneous examination and cross-examination in another place and out of the presence of the judge, jury, defendant or defendants, and attorneys, and communicated to the courtroom by means of closed-circuit television, if the court makes all of the following findings: [¶] (1) The minor's testimony will involve a recitation of the facts of any of the following: [¶] (A) An alleged sexual offense committed on or with the minor. [¶] . . . [¶] (2) The impact on the minor of one or more of the factors enumerated in subparagraphs (A) to (E), inclusive, is shown by clear and convincing evidence to be so substantial as to make the minor unavailable as a witness unless closed-circuit testimony is used. [¶] (A) Testimony by the minor in the presence of the defendant would result in the child suffering serious emotional distress so that the child would be unavailable as a witness. [¶] . . . [¶] In making the determination required by this section, the court shall consider the age of the minor, the relationship between the minor and the defendant or defendants, any handicap or disability of the minor, and the nature of the acts charged. The minor's refusal to testify shall not alone constitute sufficient evidence that the special procedure described in this section is necessary to obtain the minor's testimony. [¶] (3) The equipment available for use of closed-circuit television would accurately communicate the image and demeanor of the minor to the judge, jury, defendant or defendants, and attorneys."

### C. *Analysis*

Defendant does not challenge the constitutionality of section 1347, but argues that the trial court's ruling cannot be sustained as applied in these circumstances.

■ *Craig* held that "although face-to-face confrontation is not an absolute constitutional requirement, it may be abridged only where there is a ' "case-specific finding of necessity." ' " (*Craig, supra,* 497 U.S. at pp. 857–858.)

---

[5] Recently, Justice Sotomayor expressed a view that *Craig* does not apply to facts "strikingly different" from those in that case (*Wrotten v. New York* (2010) 560 U.S. ___, ___ [177 L.Ed.2d 316, 130 S.Ct. 2520] (mem. opn.)), but that is the view of just one justice.

Moreover, as defendant observes, *Craig* limited constitutionally permitted departures from in-court confrontations: "That the face-to-face confrontation requirement is not absolute does not . . . mean that it may easily be dispensed with. . . . [O]ur precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." (*Id.* at p. 850.) An adequate showing that the defendant's presence may cause emotional trauma is required: "The trial court must . . . find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant." (*Id.* at p. 856.)

Defendant argues that the record fails to establish to a standard of constitutional adequacy that his daughter would be traumatized specifically by his presence, as required by section 1347, subdivision (b)(2)(A). (The trial court also invoked subd. (b)(2)(C), but we need consider only subd. (b)(2)(A) and will limit ourselves to considering that provision.) In the main, defendant relies on the circumstance that, even though section 1347 permitted the trial court to question the victim in a comfortable out-of-court setting to obtain her views (§ 1347, subd. (d)(3)), the court failed to avail itself of this procedure and instead relied on the opinions of third parties, i.e., the victim's mother and the social worker.

No published decision has established a standard of review for a determination made under section 1347, but the statute specifies that the abuse of discretion standard applies. Subdivision (a) of section 1347 itself so states: "It is the intent of the Legislature in enacting this section to provide the court with discretion to employ alternative court procedures to protect the rights of a child witness, the rights of the defendant, and the integrity of the judicial process. In exercising its discretion, the court necessarily will be required to balance the rights of the defendant or defendants against the need to protect a child witness and to preserve the integrity of the court's truthfinding function. This discretion is intended to be used selectively when the facts and circumstances in the individual case present compelling evidence of the need to use these alternative procedures."

In accordance with this statutory language, the applicable standard of review for the trial court's order allowing defendant's daughter to testify via closed-circuit television is abuse of discretion.

Although the trial court did not do all that it could have, in that it did not question the victim herself, we find no abuse of discretion. The primary ground to believe an abuse of discretion occurred would be if the court had

ruled in the absence of substantial evidence.[6] In addition, the substantiality of the evidence is the focus of defendant's claim, so we need not consider other grounds for finding an abuse of discretion.

The lengthy hearing on this motion produced substantial evidence that the victim would suffer great emotional distress if forced to testify, to the point that she might not be able to provide a useful account of events for the jury. The record sets out the social worker's considered opinion, reached after conversations with the victim, that the victim would be impaired. The mother's opinion, even if based on instinct, buttressed the social worker's view in that she knew her daughter best. We find no abuse of discretion.

### III. *Sufficiency of Evidence on Charge of Exposing Victim to Harmful Matter*

Defendant claims that there is insufficient evidence to support the section 288.2, subdivision (a), conviction, and the due process clause of the Fourteenth Amendment to the United States Constitution requires its reversal. We disagree.

### A. *Background Facts*

After the victim's accusations against defendant surfaced, Detective Buhay interviewed her. During the interview, which was played to the jury, the victim responded to Detective Buhay's questions as she described a movie defendant showed her:

"Okay. So he [(defendant)] turned it back to the movie . . . what did you see on the movie?

"Like, some of the well girls and boys, some of the parts of their bodies were, some of their men parts and woman parts weren't blocked, some of it.

"What do you mean weren't blocked like you can see it?

---

[6] The statute requires the trial court to find the witness's unavailability by the standard of clear and convincing evidence. The court must find that "[t]he impact on the minor . . . is shown by clear and convincing evidence to be so substantial as to make the minor unavailable as a witness unless closed-circuit testimony is used." (§ 1347, subd. (b)(2).) That specification, however, does not direct reviewing courts also to employ the clear and convincing standard. The court's finding of clear and convincing evidence "is reviewed for substantial evidence: It resolves a mixed question of law and fact that is nonetheless predominantly one of fact, inasmuch as it 'requires application of experience with human affairs . . . .' [Citation.]" (*Estate of Joseph* (1998) 17 Cal.4th 203, 217 [70 Cal.Rptr.2d 619, 949 P.2d 472].) Thus, in determining whether the court abused its discretion, we look for substantial evidence in support of its finding.

"Umm hmm.

"And you said, you called 'em 'man parts'?

"Umm hmm.

"And 'women parts'?

"Umm hmm.

". . . Okay now, did you ever get the name for 'man parts'? Anything you learned in school or in—, or while you're growing up did you refer to the 'man parts' as anything else?

"Their penis.

"Their penis? And then as far as the 'woman parts' do you have any other words for that?

"Um, vagina.

"Any other parts that you saw besides the vagina?

"Uh ah.

"What about their breasts, did you see their breasts?

"Ah ha.

"Breasts, is that yes? What were they doing when—, when you saw them on TV the boys and the girls?

"They, um, did it."

By "it," the victim explained that she meant sexual activity and not just kissing. She described the movie as a "nasty" movie.

The jury also heard the following evidence, which places the victim's statement to Detective Buhay in context. The victim testified that defendant had a combination DVD and videocassette player connected to a television in his bedroom.[7] Sometimes he made her watch pornography; specifically, the

---

[7] It is unclear to us whether defendant showed the victim videocassette recordings, digital video disk recordings, or broadcast media. For purposes of discussion, however, it makes no difference.

movies contained "[s]ex." In these productions, there would be "[a] guy removing a girl's clothes." The men in the movies would uncover their penises and an actor would "put his penis in the vagina," but the penises were obscured on screen by pixelization—"they would cover it with like that little blob. [¶] . . . [¶] It was like covering a person's face that was wanted on TV." The man and woman would have sex and she could hear and see them perform it.

The victim further testified that on one occasion defendant started to play a movie recording and said he wanted to teach the victim "about the birds and the bees," in the prosecutor's words.

The victim's mother testified that the day after the victim disclosed the abuse, she told her that defendant "made her watch pornographic movies." Then "[t]hey," meaning the victim and defendant, " 'did it.' " The victim said that defendant had sex with her up to 10 times and it was always preceded by the showing of pornographic movies.

A school friend testified that the victim told her that defendant made her watch "bad" movies.

The licensed clinical social worker testified that the victim said she would be watching cartoons in defendant's bedroom and he would switch to what the victim described as "pornographic movies." The prosecutor asked, "Did you ask her what she meant by 'pornographic movies' ?" The witness replied, "Yeah. Naked people in the videos. That's as far as she went, a description of pornographic movies."

### B. *Applicable Law*

Under the federal Constitution's due process clause, there is sufficient evidence to support defendant's conviction if, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) The same standard applies under article I, section 15 of the California Constitution. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1083 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].) This test "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia, supra*, 443 U.S. at pp. 318–319.)

Our Supreme Court recently set forth additional principles regarding the foregoing test in the context of a challenge to a gang enhancement. "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 [119 Cal.Rptr.3d 415, 244 P.3d 1062].) *Albillar* restates or clarifies long-standing principles that apply to convictions of substantive crimes (see *People v. Johnson* (1980) 26 Cal.3d 557, 577–578 [162 Cal.Rptr. 431, 606 P.2d 738]) and is authoritative regarding due process challenges to them.

Because "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence . . ." (*People v. Albillar, supra*, 51 Cal.4th at p. 60), the effect is that on appeal "a defendant challenging the sufficiency of the evidence to support her conviction 'bears a heavy burden,' [citation] . . ." (*U.S. v. Miller* (2d Cir. 2010) 626 F.3d 682, 690–691) of showing insufficiency of the evidence and must do so in accordance with well-established standards (see generally *Jackson v. Virginia, supra*, 443 U.S. 307).

Subdivision (a) of section 288.2 provides: "Every person who, with knowledge that a person is a minor, or who fails to exercise reasonable care in ascertaining the true age of a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by any means, including, but not limited to, live or recorded telephone messages, any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent or for the purpose of seducing a minor, is guilty of a public offense and shall be punished by imprisonment in the state prison or in a county jail. [¶] A person convicted of a second and any subsequent conviction for a violation of this section is guilty of a felony."

■ The purpose of section 288.2 is to prohibit using obscene material, as defined in section 313, subdivision (a), "to groom young victims for acts of molestation." (*People v. Dyke* (2009) 172 Cal.App.4th 1377, 1384, fn. 4 [92 Cal.Rptr.3d 146] (*Dyke*).)

Section 313, subdivision (a), provides in relevant part: " 'Harmful matter' means matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

Section 313, subdivision (b), provides: " 'Matter' means any book, magazine, newspaper, video recording, or other printed or written material or any picture, drawing, photograph, motion picture, or other pictorial representation or any statue or other figure, or any recording, transcription, or mechanical, chemical, or electrical reproduction or any other articles, equipment, machines, or materials. 'Matter' also includes live or recorded telephone messages when transmitted, disseminated, or distributed as part of a commercial transaction."

This court has held that the "harmful matter" component of subdivision (b) of section 288.2 is, on its face, constitutional under the First Amendment to the United States Constitution. (*People v. Garelick* (2008) 161 Cal.App.4th 1107, 1119–1120, 1122–1124 [74 Cal.Rptr.3d 815].) Our conclusion applies equally to subdivision (a) of section 288.2, which incorporates the same "harmful matter" definition contained in subdivision (a) of section 313 as does subdivision (b) of section 288.2. *Garelick* compels the conclusion that section 288.2, subdivision (a), meets First Amendment requirements on the face of the statute.[8] Defendant's challenge, however, is to the statute as applied to him. He does not quarrel with the statute's validity in principle. That is, he does not argue that nobody may be punished under subdivision (a) of section 288.2, but only that the evidence did not suffice to sustain his own conviction pursuant to the provision.

Through its incorporation by reference of subdivision (a) of section 313, subdivision (a) of section 288.2 prohibits exhibiting material that might be suitable for adults but is not for minors. That is an acceptable legislative action as long as it comports with other constitutional requirements. *Ginsberg v. New York* (1968) 390 U.S. 629 [20 L.Ed.2d 195, 88 S.Ct. 1274] stated, "The 'girlie' picture magazines involved in the sales here are not

---

[8] There are two substantive provisions in section 288.2: subdivisions (a) and (b). They differ as follows: First, following reference to one who acts "with knowledge that a person is a minor"—a clause present in both subdivisions—subdivision (a) includes the clause "or who fails to exercise reasonable care in ascertaining the true age of a minor." Second, both subdivisions punish an actor who "knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit" harmful matter, but subdivision (a) forbids doing so "by any means, including, but not limited to, live or recorded telephone messages," whereas subdivision (b) forbids doing so "by electronic mail, the Internet, as defined in Section 17538 of the Business and Professions Code, or a commercial online service . . . ."

obscene for adults [citation]. But [the state law at issue] does not bar the appellant from stocking the magazines and selling them to persons 17 years of age or older, and therefore the conviction is not invalid . . . [citation]." (*Id.* at pp. 634–635, fn. omitted.) "The state may adopt a standard of obscenity applicable to minors which is broader than that applicable to adults and which denies minors access to materials to which adults could not be denied access." (*American Booksellers Assn., Inc. v. Superior Court* (1982) 129 Cal.App.3d 197, 201 [181 Cal.Rptr. 33]; accord, *Ginsberg, supra*, at pp. 636–637; *Bookcase, Inc. v. Broderick* (1966) 18 N.Y.2d 71, 75 [271 N.Y.S.2d 947, 218 N.E.2d 668, 671]; see also *People v. Garelick, supra*, 161 Cal.App.4th at p. 1124.)

Subdivision (a) of section 313 codifies one United States Supreme Court test for constitutionally unprotected obscenity: to withstand a First Amendment challenge to government action that seeks to suppress material as obscene, "the Government must prove that the work, taken as a whole, appeals to the prurient interest, is patently offensive in light of community standards, and lacks serious literary, artistic, political, or scientific value." (*Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 246 [152 L.Ed.2d 403, 122 S.Ct. 1389]; accord, *United States v. X-Citement Video, Inc.* (1994) 513 U.S. 64, 74, fn. 4 [130 L.Ed.2d 372, 115 S.Ct. 464].) In this test, the "taken as a whole" component applies to all three definitional prongs.

Another test, found in the landmark case of *Miller, supra*, 413 U.S. 15, omits the "taken as a whole" requirement from the second definitional prong, i.e., the "patently offensive" specification, but includes in that prong the requirement that it apply to sexual conduct defined by state law. *Miller* stated that whether material is obscene and hence unprotected by the First Amendment is determined by "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest [citation]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." (*Miller*, at p. 24; accord, *Ashcroft v. American Civil Liberties Union* (2002) 535 U.S. 564, 574 [152 L.Ed.2d 771, 122 S.Ct. 1700]; see *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 873 [138 L.Ed.2d 874, 117 S.Ct. 2329].)

In other words, " 'the *Miller* obscenity test does not incorporate the "taken as a whole" standard into the second part of the test . . .' " (*American Booksellers v. Webb* (11th Cir. 1990) 919 F.2d 1493, 1503, fn. 18) found in subdivision (a) of section 313. We, like *Webb*, think it safe to say the following about the "taken as a whole" aspect of the second obscenity-test prong found in some United States Supreme Court decisions: "even assuming

*arguendo* that *Miller* relaxed the standard, the [statutory] definition and those like it are either (1) completely consistent with *Miller*, or (2) narrower than the second prong of the more recent test articulated in *Miller*. A state is entirely free to adopt a test for obscenity that is narrower than current First Amendment jurisprudence requires." (919 F.2d at p. 1503, fn. 18.)

We will, accordingly, not undertake further consideration of the constitutionality of section 313, subdivision (a), and will apply the provision according to its terms, including the "taken as a whole" specification for its "patently offensive" definitional prong.

■ The *Miller* definition and section 313's "harmful matter" definition also differ in these respects: "under section 313 the relevant community standard by which the material is evaluated is 'statewide . . .' " (*Dyke, supra*, 172 Cal.App.4th at p. 1383) and, as we have noted, taken as a whole "the work must lack serious literary, artistic, political, or scientific value *for minors.*" (*Ibid.*) Under section 313, however, the minors do not decide what content is acceptable for them (see 172 Cal.App.4th at p. 1384, fn. 5); rather, "the 'average person' applying 'contemporary statewide standards' is . . . an average *adult* applying *adult* standards . . ." (*id.* at p. 1383) and "whether sexual conduct is depicted or described in a patently offensive way" (*ibid.*) is done "using . . . *adult* standards" (*ibid.*, fn. omitted).

### C. *Analysis*

Before we explain why we conclude the passage quoted *ante*, at pages 1284–1285, satisfies the constitutional sufficient-evidence requirement, we will address pertinent legal, factual, and mixed-law-and-fact considerations.

Defendant asserts that the victim's characterizations of the movies as "bad," "nasty," and "pornography," in her own words or through the testimony of witnesses permissibly (Evid. Code, § 1360) relating her statements, are too amorphous to satisfy the requirements of section 313, subdivision (a). The police did not seize the movies and there is no evidence of their content beyond the victim's characterizations of them. Yet using such material is sanctionable only if, under the prongs of subdivision (a) of section 313, taken as a whole it "depicts or describes in a patently offensive way sexual conduct," "lacks serious literary, artistic, political, or scientific value for minors," and "to the average person, applying contemporary statewide standards, appeals to the prurient interest." The essence of defendant's challenge is that if the trier of fact knows virtually nothing about the movies' content, the judgment of conviction rests on too flimsy a foundation to satisfy the Fourteenth Amendment's due process guaranty.

This was the conclusion in *Dyke, supra*, 172 Cal.App.4th 1377, a case in which the complainant saw two movies, one of which "showed a naked

woman dancing" (*id.* at p. 1380) and the other the upper bodies of a man and a woman who appeared to be " 'having sex' " (*ibid.*). "What is missing from this record," *Dyke* concluded, "is any context by which the reasonable trier of fact can make [a] determination. There is only a bare-bones recital by [the complainant] of what she saw . . ." (*id.* at p. 1385)—the two scenes just described "and her own characterization of [the content] as 'pornography.' Without more, neither we nor the jury are permitted to presume that such content is patently offensive to the average adult, applying statewide community standards" (*ibid.*) under section 313, subdivision (a).

In turn, the People argue that "a reasonable jury could infer that the movies appellant forced [the victim] to watch contained only graphic sexual conduct. A movie that contains no plot and functions merely as a vehicle to display sexual acts for its own sake is generally considered patently offensive. [¶] Likewise, movies that show graphic intercourse with the genitals obscured are inevitably offensive to the average adult. Indeed, the 'blob' is essentially an acknowledgment that the film is directed solely at prurient interests. On the other hand, films with artistic aspirations typically take pride in their depiction of sexuality." "Indeed, it appears that the defendant in *Dyke* was flipping through ordinary cable television stations—not adult oriented premium channels. That is distinguishable from the present case where the DVDs were unquestionably considered 'adult entertainment'; the actors in the movies were naked with their genitals sometimes obscured; they engaged in explicit sexual activity; and the movies functioned solely as vehicles to show that sexual activity."

Much less can be gleaned from the record than the People's reasoning can support, however. What was true in *Dyke, supra,* 172 Cal.App.4th at page 1384, footnote 5—that the victim "referred to what she saw as 'pornography,' " but "there was no testimony as to what she meant by that term, or how broadly it may have been intended"—is true of most of the testimony here too. The People have not directed us to anything in the record that might support the notions that (1) a movie defendant made the victim watch "contains no plot and functions merely as a vehicle to display sexual acts," (2) "movies that show graphic intercourse with the genitals obscured are inevitably offensive to the average adult," (3) pixelization of external genitalia "is essentially an acknowledgment that the film is directed solely at prurient interests," or (4) defendant and the victim were watching "adult oriented premium channels" or equivalent video recorded content.

█ We agree with defendant that nudity or depictions of sexual intercourse or other sexual activity do not, by themselves, make a movie obscene. Were it otherwise, not only would video store shelves be quite bare, either because of legal scruples or following police raids, but a number of currently

available television programs would not be seen. Commercial television pulls back the curtain on sexual expression ever further with each passing year. "According to a study released yesterday by the Henry J. Kaiser Family Foundation, a public health organization in Los Angeles, one out of seven shows features sexual intercourse, either depicted or strongly implied. . . . [A] Kaiser vice president who oversaw the survey . . . said, 'And I am counting "Jeopardy." ' Four years ago the figure was one out of 14 shows. [¶] Two-thirds of all shows from 7 a.m. to 11 p.m. have some sexual content, ranging from talk about sex to depictions of sexual behavior. Four years ago Kaiser found the figure was about half that." (Stanley, *It's a Fact of Life: Prime-Time Shows Are Getting Sexier*, N.Y. Times (Feb. 5, 2003) available online at <http://www.nytimes.com/2003/02/05/arts/the-tv-watch-it-s-a-fact-of-life-prime-time-shows-are-getting-sexier.html> [as of Apr. 29, 2010].) " 'Acceptability is an ever expanding and retracting elastic band,' " a network news executive told The New York Times. (<http://www.nytimes.com/2003/02/05/arts/the-tv-watch-it-s-a-fact-of-life-prime-time-shows-are-getting-sexier.html%3E?pagewanted=2> [as of Apr. 29, 2010].)

Thus, what needed explaining a half-century ago, namely that "sex and obscenity are not synonymous" (*Roth v. United States* (1957) 354 U.S. 476, 487 [1 L.Ed.2d 1498, 77 S.Ct. 1304]), is now an unremarkable aspect of the visual media. In *Ashcroft v. Free Speech Coalition, supra*, 535 U.S. 234, the United States Supreme Court "noted that the year before the opinion was written, one of the Academy Award nominees for Best Picture was Traffic (USA Films 2000), in which a 16-year-old addict was trading sex for drugs. It observed further that the year before that, the film American Beauty (DreamWorks Pictures 1999) won the Academy Award for Best Picture, a movie in which 'a teenage girl engages in sexual relations with her teenage boyfriend, and another yields herself to the gratification of a middle-aged man. The film also contains a scene where, although the movie audience understands the act is not taking place, one character believes he is watching a teenage boy performing a sexual act on an older man.' " (*Dyke, supra*, 172 Cal.App.4th at pp. 1385–1386.)

*Ashcroft v. Free Speech Coalition, supra*, 535 U.S. 234, listed American movies, but it could also have mentioned the availability in the United States of foreign films on cable and satellite television and in recorded media. Numerous foreign films contain sexually graphic scenes, from Bernardo Bertolucci's well-known Last Tango in Paris (Ultimo tango a Parigi) (Les Productions Artistes Associés and Produzioni Europee Associati 1972) to less known but respected films such as Jean-Jacques Annaud's The Lover (L'Amant) (Films A2, Grai Phang Film Studio, Renn Productions, and Timothy Burrill Productions 1992) and Lúcia Murat's Almost Brothers (Quase Dois Irmãos) (Taiga Filmes, Ceneca Producciones, and TS Productions 2004). The victim here mentioned frontal male nudity, but frontal male nudity does

not necessarily make a movie obscene. Harvey Keitel appears nude from the front in Jane Campion's The Piano (The Australian Film Commission, CiBy 2000, Jan Chapman Productions, and New South Wales Film & Television Office 1993), an acclaimed Australasian and French movie set in New Zealand. The global French-language satellite television network TV5MONDE sometimes broadcasts movies with nudity and explicit sexual content.

Depending on various external factors, such movies could be shown, with or without the pixelization the victim mentioned (a factor that would slightly reduce the sexual explicitness of one or more scenes), without falling within the scope of section 313, subdivision (a), which speaks to obscene material lacking First Amendment protection. "If these films, or hundreds of others . . . , contain a single graphic depiction of sexual activity within the statutory definition, the possessor of the film would be subject to severe punishment without inquiry into the work's redeeming value. This is inconsistent with an essential First Amendment rule: The artistic merit of a work does not depend on the presence of a single explicit scene." (*Ashcroft v. Free Speech Coalition, supra*, 535 U.S. at p. 248.)

Thus, the victim's accounts of seeing "bad" and "nasty" movies featuring "pornography" are insufficient. The record does not offer, except on one occasion, a basis for us to determine whether defendant forced the victim to watch obscene pornography or instead nonobscene art-house movies. The exception is the description we quote *ante*, at pages 1284–1285. As we will now explain, the victim was describing the forced viewing of so-called hardcore, and hence constitutionally unprotected, pornography of the type that forms the basis for the offense described in section 288.2, subdivision (a), incorporating for that purpose section 313, subdivision (a).

Under *Miller*, so-called hardcore pornography does not enjoy First Amendment protection: "no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct specifically defined by the regulating state law, as written or construed." (*Miller, supra*, 413 U.S. at p. 27.)

*Miller* makes plain that "hard-core pornography is synonymous with obscene pornography." (*State v. Myers* (2009) 146 N.M. 128, 136 [207 P.3d 1105, 1113].) "Based on *Miller*, the law distinguishes between hard-core pornography and soft-core pornography, which involves depictions of nudity and limited and simulated sexual conduct. Because it is not as graphic or explicit as hard-core pornography, soft-core pornography is protected under the First Amendment." (8 West's Encyclopedia of American Law, Pornography (1st ed. 1998) p. 113, col. 2.)

Inevitably, the contours of hardcore pornography are not precise. (See *Powell's Books, Inc. v. Kroger* (9th Cir. 2010) 622 F.3d 1202, 1210 [expressing uncertainty about "the precise boundaries of hardcore pornography"].) In addition, the type of content considered patently offensive under the second prong of the three-prong *Miller* standard[9] has shifted over time and is reflected in the presence of so-called softcore pornography in late-night mainstream cable or satellite television programming. It portrays acts of sexual intercourse and other sexual conduct accompanied by minimal plot development. (See Weinbach, *Soft-core porn still hot stuff on cable TV*, L.A. Times (May 10, 2010), available online at <http://articles.latimes.com/2010/may/10/entertainment/la-et-cable-porn-20100510> [as of Apr. 29, 2011] (Weinbach).)

Under a peculiar convention of the adult movie industry, hardcore pornography is distinguished from its more mainstream soft-core counterpart by such things as lewd displays of the penis. "All of the premium channels will air films that are rated X by the Motion Picture Assn. of America, but they also adhere to certain self-imposed guidelines when it comes to sexy material. In general, cable channels won't show full male frontal nudity or extended close-up shots of female private parts. 'Our producers know where the lines are,' says [the] executive vice-president of program planning for HBO Networks, which owns Cinemax." (Weinbach <http://articles.latimes.com/2010/may/10/entertainment/la-et-cable-porn-20100510/2> [as of Apr. 29, 2011].) "Softcore (or soft porn) is a form of pornography, either video or nude glamour photography, that is less explicit than hardcore material in depicting or describing sexual behavior. Softcore does not depict explicit sexual contact, but ranges from nudity to simulated intercourse. While both softcore and hardcore feature sexual situations with the intention of arousing the viewer, the key difference is that softcore does not clearly show aroused genitalia (including masturbation), ejaculation, or penetration (vaginal, anal and/or oral)." (Webster's Online Dict., Extended Definition: Softcore, available online at <http://www.websters-online-dictionary.org/definitions/Softcore> [as of Apr. 29, 2011].) "In contrast to hard-core pornography, which depicts full male nudity and actual sex, soft-core sex is more simulated than real, and the films usually attempt to have coherent storylines and dialogue." (Weinbach <http://articles.latimes.com/2010/may/10/entertainment/la-et-cable-porn-20100510/3> [as of Apr. 29, 2011].)

Both forms of pornography are sexually explicit and both fit within most of the victim's terse descriptions of the movies defendant forced her to watch.

---

[9] Namely, "(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated. [¶] (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." (*Miller, supra,* 413 U.S. at p. 25.)

These were vague descriptions that could apply to First Amendment–protected soft-core pornography that lies outside the ambit of section 313, subdivision (a). Even softcore pornography "does not aspire to high art." (Weinbach <http://articles.latimes.com/2010/may/10/entertainment/la-et-cable-porn-20100510/3> [as of Apr. 29, 2011].) " 'There's nothing creative about this—you're going to see sex in the first minute and you're going to see sex every seven or eight minutes after that . . . .' " (*Ibid.*)

■ The victim's more detailed statement that we have quoted *ante*, at page 1284, however, makes all the difference. What makes this case unlike *Dyke, supra*, 172 Cal.App.4th 1377, and persuades us that there is a minimum of evidence to sustain the conviction is that the victim here told Detective Buhay that in one sexually oriented movie "some of their men parts and women parts weren't blocked." Penises, breasts, and vaginas featured in lewd displays as the actors "did it," i.e., engaged in sexual activity and not just kissing. Notwithstanding the constitutional and definitional barriers to a conviction under section 288.2, subdivision (a), and the lack of detail in most of the victim's descriptions about the material defendant forced her to watch, we uphold the conviction against defendant's due process challenge because of the victim's description of seeing a movie in which actors engaged in simulated or unsimulated sexual activity while displaying all of those body parts. The foregoing evidence suffices to uphold the jury's verdict. Although the evidence is not rich in detail, it is nevertheless adequately descriptive. Moreover, it is "credible, and of solid value." (*People v. Albillar, supra*, 51 Cal.4th at p. 60.) It meets the minimum required for a rational trier of fact to conclude that defendant forced the victim to watch obscene depictions within the meaning of section 313, subdivision (a), an act punishable under section 288.2, subdivision (a). Therefore, we reject defendant's due process challenge.

### IV. *Claim That Sentence Must Be Stayed on Harmful Matter Conviction*

Defendant claims that the trial court erred under section 654 in failing to stay the sentence on the harmful matter conviction (§ 288.2, subd. (a)). He notes that the victim testified that he made her watch pornographic movies before having sex with him and, therefore, making her view the movies was an inseparable part of the means to accomplish that ultimate goal.

We disagree. The trial court could reasonably find that showing the victim the pornographic movies and sexually abusing her were separate acts with separate intents.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under

the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

 "Section 654 prohibits multiple punishment for a single criminal act and for two crimes arising from a single indivisible course of conduct in which the defendant had only one criminal intent or objective. [Citation.] Thus: 'If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Conners* (2008) 168 Cal.App.4th 443, 458 [85 Cal.Rptr.3d 627], fn. omitted.)

"We review under the substantial-evidence standard the court's factual finding, implicit or explicit, of whether there was a single criminal act or a course of conduct with a single criminal objective." (*People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603 [80 Cal.Rptr.3d 551].)

There was substantial evidence for the trial court's implicit finding that defendant harbored separate intents. Defendant played the movies in an unavailing effort to arouse the victim sexually, an act and an intent punishable under section 288.2, subdivision (a). Conversely, defendant raped the victim to gratify himself, an act and an intent punishable under section 288.7, subdivision (a).[10] As the People comment, "[defendant] intended to arouse [the victim], but also intended to have sex with her regardless of whether she actually became aroused. Therefore, the two crimes had separate objectives because they were intended to arouse different people; and [defendant] had multiple intents, i.e., to arouse [the victim] for sex and to have sex with [the victim] even if she were not aroused." The reasoning of *People v. Hairston* (2009) 174 Cal.App.4th 231 [94 Cal.Rptr.3d 159], applies here: " 'If . . . the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct.' " (*Id.* at p. 240.) Defendant's claim is without merit.

---

[10] That provision states: "Any person 18 years of age or older who engages in sexual intercourse or sodomy with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 25 years to life." (§ 288.7, subd. (a).)

### V. *Court's Failure to State Reasons for Imposing Consecutive and Aggravated Term on Harmful Matter Conviction*

Defendant argues that the trial court erred under state law by failing to state reasons for imposing the three-year upper term on the harmful matter conviction (§§ 18, 288.2, subd. (a)) and for imposing consecutive terms on the two convictions. He seeks the remedy of a remand to superior court for resentencing.

Defendant has forfeited the claim by failing to raise it at the time of sentencing.

Defendant is correct that the trial court did not state reasons for imposing the aggravated term for the section 288.2, subdivision (a), conviction, or why the two terms must run consecutively.

Defendant is also correct that the trial court was required to do so.

"Section 1170, subdivision (c), provides that the court 'shall state the reasons for its sentence choice on the record at the time of sentencing.' The decision to impose consecutive rather than concurrent sentences is a 'sentence choice' within the meaning of this section. [Citations.] An express statement of reasons is required to support such a choice." (*People v. Sanchez* (1994) 23 Cal.App.4th 1680, 1684 [29 Cal.Rptr.2d 367].)

The same rule applies to imposition of an aggravated determinate term. " 'In imposing an upper term, the court must set forth on the record "facts and reasons" [citation], including the "ultimate facts that the court deemed to be circumstances in aggravation." [Citation.]' " (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1324–1325 [88 Cal.Rptr.3d 41].)

Defendant did not object, however, when the trial court imposed sentence without stating its reasons on the record. The court even asked, "Is there anything further for the record?" and defense counsel replied "No, sir." By failing to raise a contemporaneous request for the court to state reasons for its sentencing decisions, defendant failed to preserve the claim for review. "In general, the forfeiture rule applies in the context of sentencing as in other areas of criminal law. As a general rule neither party may initiate on appeal a claim that the trial court failed to make or articulate a ' "discretionary sentencing choice[.]" ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 881 [55 Cal.Rptr.3d 716, 153 P.3d 282].) "[W]hen the trial court fails to make or properly articulate a discretionary sentencing choice, the defendant must object in order to preserve the claim on appeal." (*Ibid.*)

Accordingly, defendant failed to preserve this claim for review and we may not entertain it except to deny defendant's request for a remand. "[D]efendant has forfeited the argument. Under these circumstances, no remand is required." (*People v. Avila* (2009) 46 Cal.4th 680, 729 [94 Cal.Rptr.3d 699, 208 P.3d 634].)

## VI. *Ineffective Assistance of Counsel Claim*

Defendant contends that if we conclude he forfeited the sentencing claim he raises immediately above, then counsel's failure to ask the trial court to state its reasons for imposing a consecutive sentence and the upper term on the section 288.2, subdivision (a) conviction constitutes ineffective assistance of counsel.

We do not agree.

**(12)** The burden of proving a claim of ineffective assistance of counsel is on defendant, and he must prove his claim by a preponderance of the evidence. (*In re Thomas* (2006) 37 Cal.4th 1249, 1257 [39 Cal.Rptr.3d 845, 129 P.3d 49].) Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, a criminal defendant has the right to the effective assistance of counsel. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) "The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result." (*Ibid.*) A claim of ineffective assistance of counsel in violation of the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of an adverse effect on the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052].) The *Strickland* standards also apply to defendant's claim under article I, section 15 of the California Constitution. (E.g., *People v. Waidla* (2000) 22 Cal.4th 690, 718 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

"If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington, supra,* 466 U.S. at p. 697.) Such is the case here.

It appears to us that the trial court was in agreement with the probation officer about the proper sentence. At the sentencing hearing, the court stated that it had read and considered the probation report and the language the court used in imposing sentence followed the probation officer's recommendations. As the People observe, given that the sentence the court meted out

coheres with the details of the probation report's recommendations, "the natural inference is that it agreed with its findings." We discern no reasonable probability that the court would have relied as notably as it did on the report without agreeing with its sentencing recommendation. We discern no prejudice and hence conclude that there was no ineffective assistance of counsel.

## DISPOSITION

The judgment is affirmed.

Rushing, P. J., and Premo, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 17, 2011, S193771.