Filed 9/21/15  P. v. White CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C076189 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF-11-1121) |
| v. | |
| ANDREW LAWRENCE WHITE, | |
| Defendant and Appellant. | |

Defendant Andrew Lawrence White appeals from a robbery conviction.  He contends (1) the trial court prejudicially erred by admitting evidence of uncharged robberies; (2) there is insufficient evidence of identity to support the conviction; (3) the trial court prejudicially erred by permitting a police officer to provide lay opinion testimony; (4) even if none of these errors individually was prejudicial, their cumulative effect was; and (5) he is entitled to additional presentence custody credit.  Because we find only his last contention meritorious, we will modify the judgment to award defendant additional presentence custody credit, and will otherwise affirm the judgment.

1

# FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with robbing Abdulla and Susan Fattah on August 18, 2008.[1]  (Pen. Code, §§ 211, 212.5, subd. (c).)  It was further alleged defendant intentionally discharged a firearm in the commission of the robbery, causing great bodily injury.  (Pen. Code, § 12022.53, subd. (d).)  A jury found defendant guilty of the robbery, but deadlocked on the enhancement allegations.  Prior to retrial, the information was amended to add allegations that defendant intentionally and personally discharged a firearm in the commission of the robbery, and that he personally used a firearm in the commission of the robbery.  (Pen. Code, § 12022.53, subds. (b)-(c).)  Following retrial, a separate jury found true the allegations that defendant personally used and intentionally and personally discharged a firearm in the commission of the robbery, but found not true the allegations that defendant intentionally discharged a firearm in the commission of the robbery, causing great bodily injury.

## August 18 Robbery

Just before 10:00 p.m., two men entered Bryte Way Market, a small neighborhood grocery store in West Sacramento, where owners Abdulla and Susan Fattah were working.[2]  One man wore a dark blue hooded sweatshirt and the other wore a black hooded sweatshirt; both wore baseball caps underneath their hoods and wore bandannas covering their faces.  The man in the blue hooded sweatshirt carried a sawed-off shotgun and directed Susan to open the cash register.  She complied, and the armed man reached across the counter and took cash from the register.  Susan heard a gunshot nearby behind her; when she stood up, she saw blood on the floor near where her husband had been

---

[1]  All further calendar references are to the year 2008 unless otherwise indicated.

[2]  As the victims share a surname, we will refer to them by their first names; no disrespect is intended.  Abdulla died from an illness in 2010, prior to trial; Susan, who continued to operate the market, testified at trial.

standing.  Abdulla followed the robbers out of the store; when he came back inside, blood was dripping from a gunshot wound above his wrist.  When reviewing surveillance footage of the incident later, Susan noticed the armed man had dark skin and what looked like a tattoo on his wrist.  She could also tell from the assailant's voice that he was male.

*August 25 Robbery*

At about 9:45 p.m., two men with masked faces entered Circle D Store in Sacramento.  One of the men, who was holding a "big gun," later described as a sawed-off shotgun, walked around the counter where the cash register was located, opened the cash register, took money from the register, directed the store employee to lie down, and then left.  The man with the gun was wearing gloves, a dark blue hooded sweatshirt, a bandana covering his masked face, dark jeans, and a baseball cap.  The other man was wearing a black hooded sweatshirt, gloves, and dark jeans.

*August 28 Robbery*

Prior to closing, two men entered American Food Store, a convenience store associated with a gas station, located in Orangevale.  One of the men jumped over the counter, pointed a gun at the store owner, and directed him to lie down.  The armed man, who carried a sawed-off shotgun, then broke the phone and directed the owner to open the cash register.  Once he did, the armed man took all the money, placed it in his pockets, left the store, and, as he was leaving, broke the phone of a customer who had entered the store during the robbery.  The robber was wearing a dark blue hooded sweatshirt, baseball cap, blue bandana covering his face, and gloves; and the other man wore a black hooded sweatshirt and had a covered face.

Following the robbery, the owner of the store asked police to place a one dollar bill laced with a tracking device, secured in a rubber-banded stack of bills, in the cash drawer so that police could track the cash if another robbery occurred.

3

*September 8 Robbery*[3]

Prior to closing, two men entered American Food Store (the same location as the August 28 robbery) and approached the counter where the cash register was located. The men were wearing blue clothing, their faces were covered, and one of them had a gun. The one with the gun came around the counter, directed the store employee to lie down on the ground, took cash from the register, and both men left. The store owner, who was also present for this robbery, testified that the two men who robbed the store on September 8 were the same men who robbed the store on August 28: They wore the same clothing, were the same height, and the robbery was similar. In both instances, the taller man had the gun and wore gloves.

Among the cash taken in this robbery was the cash containing the police tracking device that had previously been placed in the cash register. Once the device was removed from the cash register, police were automatically notified and began to track its location. Police tracked the device to a location in Sacramento, and then pursued and captured the suspects, including "a black male in a blue-hooded sweatshirt and black jeans" with a black "doo-rag" and black shoes—defendant, who had the cash with the tracking device and a single black glove on his person. Police escorted the store owner to the location, where he was able to identify defendant as the armed robber based on his height, build, "structure," skin color, and clothing.

---

[3] In contrast to the other three incidents, we did not receive a working copy of the surveillance video of the September 8 robbery, which was apparently played for the trial court and jury. Our efforts to obtain an alternative copy of the video from the trial court and the parties were unsuccessful. It is defendant's burden on appeal to show, as he claims, (1) that the trial court erred in admitting this video as evidence of identity and (2) that there was insufficient evidence of identity. (See *People v. Powell* (2011) 194 Cal.App.4th 1268, 1287; see also *People v. Malabag* (1997) 51 Cal.App.4th 1419, 1427.) Because he has failed to meet this burden, we assume the video would support the trial court's decision and the judgment. (See, e.g., *Estate of Fain* (1999) 75 Cal.App.4th 973, 992.)

*Defense Evidence*

Defendant's employer testified that defendant was at work on August 18, at a business located just west of Lodi. Defendant worked there full time, as a supervisor; within his job duties, he had daily access to cash. On August 18, defendant worked from 8:30 a.m. until 1:00 p.m. Defendant's cousin (and the cousin's friend) testified that defendant attended a funeral for a relative on the afternoon of August 18 in Stockton. Following the funeral service, defendant and his family ate at a restaurant in Stockton and then gathered at a park, where they remained until after 9:00 p.m. Defendant's mother testified that defendant did not attend the service because he was working. She added, however, that defendant joined the family at the restaurant at about 3:00 p.m. and joined the family at the park sometime after 5:30 p.m., where he remained until between 9:30 and 9:45 p.m. He then returned to his mother's house in Stockton.

*Retrial Evidence*

Susan Fattah described that she heard a gunshot coming from the direction where the armed robber was; that when she looked up, there was blood on the floor where her husband had been before; that when she next saw her husband, his arm was hanging and dripping blood; the wound was "an open bloody mess"; her husband was treated at the hospital that night and had followup treatments thereafter. A store employee present at the time of the robbery saw the robber point a gun at Susan's head; and then heard a shot, saw drops of blood on the floor, and then saw that Abdulla was bleeding profusely. Abdulla's medical records from the night of the robbery were also presented, indicating that he suffered "a large soft tissue" injury to his right forearm and wrist, with remnants of the shotgun shot left in the arm.

The owner of the convenience store involved in the August 28 and September 8 robberies also recounted those events, as well as his identification of defendant as the armed robber. A patrol officer whose dashboard tracker system alerted to the activation

of the tracking device on September 8, recounted seeing a man in dark clothing and a blue hooded sweatshirt leave the convenience store carrying a shotgun and blue duffel bag. And the officer who caught the fleeing defendant that night, testified he found the tracking device, a black glove, a cell phone, and the defendant's wallet on his person. Defendant was wearing a blue hooded sweatshirt and black jeans when he was arrested following the September 8 robbery.

Defendant presented evidence that he does not have tattoos on his wrists.

*Sentencing*

The trial court sentenced defendant to an aggregate sentence of 32 years eight months in state prison: the upper term of five years for the second degree robbery of Abdulla, a consecutive 20 years for the intentional and personal discharge of the firearm in the robbery of Abdulla, an additional 10 years (stayed) for personal use of a firearm in the commission of the robbery of Abdulla, a consecutive one year (one-third the middle term) for the robbery of Susan, a consecutive six years eight months (one-third the term of 20 years) for the intentional and personal discharge of the firearm in the robbery of Susan, and an additional term of three years four months (one-third the term of 10 years) (stayed) for personal use of a firearm in the commission of the robbery of Susan. Based on its election of this as the principal case (Yolo County Super. Ct. case No. CRF-11-1121), the trial court resentenced defendant to an aggregate term of 16 years for Sacramento County case No. 08F07444, to run consecutive to his sentence in the instant case. The trial court additionally awarded defendant 1,139 days of credit (991 actual days plus 148 days of presentence conduct credit) in addition to the 753 days of

6

credit previously awarded by the Sacramento County Superior Court (655 actual plus 98 conduct), for a total of 1,892 days.[4]

## DISCUSSION

### I.  Evidence of Uncharged Robberies

Defendant challenges the trial court's ruling permitting the introduction of evidence of the August 25, August 28, and September 8 robberies ("the uncharged robberies") to establish that he was the perpetrator of not only those robberies but the August 18 robbery (the charged offense) as well.  Specifically, he contends the fact that in each robbery two men entered a business prior to closing, with the gunman wearing a blue hooded sweatshirt, dark bandana, cap and gloves, is not sufficiently distinctive to support admission of that evidence to prove identity.  He also contends the evidence was unduly prejudicial and time-consuming.  We are not persuaded.

Prior to trial, defendant moved in limine, pursuant to Evidence Code sections 352 and 1101,[5] to exclude evidence of the uncharged robberies.  The People argued the evidence was relevant to prove identity and common plan or scheme because video footage showed defendant wore jeans, a bandana and the same blue sweatshirt in each of the robberies; he wore gloves with a spider web design; he carried a shotgun, if a gun was used; phones were always destroyed; the robberies were between 9:30 and 11:30 p.m.; and the same codefendant was present.  After viewing video footage of the robberies, the trial court permitted evidence of the uncharged robberies, reasoning that the charged and uncharged robberies involved the use of a firearm, and in each of the robberies, "the primary armed defendant wore a blue hooded sweatshirt, dark pants, jeans, and a mask

---

[4]  The abstract of judgment and sentencing minutes erroneously reflect that defendant was awarded only 1,131 days of credit.

[5]  Undesignated statutory references are to the Evidence Code.

7

over his face while the robber who was not armed is smaller in physical stature. He wore a black sweatshirt with the hood up so his face was covered as well. [¶] In the—both the Yolo and Sacramento robberies the robbers took money from the cash register itself. They also took some merchandise, but the critical thing is taking the money out of the cash register." The trial court also emphasized that the August 28 and September 8 robberies involved the same store, and that the pattern of those robberies is "remarkably similar" to the August 18 robbery, and the August 25 robbery involved the same clothing and was "extremely similar" to the August 18, August 28, and September 8 robberies.

Evidence of a person's character, including uncharged acts of misconduct, is inadmissible to prove the conduct of that person on a specific occasion. (§ 1101, subd. (a).) However, such evidence is admissible to prove some material fact other than the person's character, such as identity. (§ 1101, subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) " 'Evidence of *identity* is admissible where it is conceded or assumed that the charged offense was committed by someone, in order to prove that the defendant was the perpetrator.' [Citation.] The admissibility of other crimes evidence for this purpose 'turns on proof that the [incidents] share *sufficient distinctive common features* to raise an inference of identity.' [Citation.] We have often commented that ' "[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." ' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1306.) However, it is not necessary to prove that the charged and uncharged offenses are "identical in every detail." (*People v. Renchie* (1963) 217 Cal.App.2d 560, 563; accord, *People v. Perez* (1967) 65 Cal.2d 615, 619.)

Even if evidence of the uncharged acts is admissible under section 1101, it may still be excluded pursuant to section 352 "if its probative value is substantially outweighed by the probability that its admission will require undue time consumption, will confuse or mislead the jury, or poses a substantial risk of undue prejudice." (*People*

*v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 406-407.)  In this context, the word "prejudice" is used in the sense of " ' "of 'prejudging' a person or cause on the basis of extraneous factors." ' " (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.)  The term does not connote "the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is "prejudicial."  The "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)  In deciding whether evidence should be excluded pursuant to this section, " '[t]he court must consider " 'the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relative to the main or only a collateral issue, and the necessity of the evidence to the proponent's case as well as the reasons recited in section 352 for exclusion.' " ' " (*People v. Houston* (2005) 130 Cal.App.4th 279, 304.)

We review the trial court's ruling admitting the evidence under the abuse of discretion standard (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496), and reverse only if the trial court's ruling was " 'arbitrary, capricious or patently absurd' " and caused a " 'manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

The trial court did not abuse its discretion in concluding evidence of the uncharged robberies was admissible to prove identity pursuant to section 1101, subdivision (b).  We do not agree with defendant that the common elements of the crimes are so generic as to be indistinct.  Rather, there were a number of distinctive similarities between the charged and uncharged crimes.  There were always two perpetrators involved; the perpetrators wore the same clothing (masked faces, dark jeans, dark hooded sweatshirts, and gloves, with the armed perpetrator always wearing a bandana on his face as well) in each

9

robbery; the same perpetrator (the taller or larger one) always carried the gun; the same or a similar gun (sawed-off shotgun) was used in each of the robberies; the robberies were always committed at approximately the same time of night (prior to closing); the robberies were all in the Sacramento area (Orangevale, Sacramento, and West Sacramento); the robbers always took cash directly from the cash register; and all the robberies were committed over the span of three weeks. Additionally, though there were some factual differences, in light of the distinctive shared features between the charged August 18 robbery and the uncharged August 25, August 28, and September 8 robberies, evidence of the circumstances surrounding the uncharged robberies supports the reasonable inference that the individual who committed those robberies also committed the August 18 robbery. Therefore, we conclude evidence related to the uncharged robberies was relevant to the issue of identity with regard to the August 18 robbery.

Nor did the trial court err in finding the evidence admissible under section 352. Identity of the perpetrator was the principal issue at trial. None of the eyewitnesses were able to identify the perpetrators beyond a description of their size and clothing, which is all that the video footage from the August 18 robbery portrayed as well. There was no DNA, blood, or hair evidence from the robbery, and there was no evidence that anyone had been found spending the money stolen from the store that night or admitting involvement in the robbery. There were, however, these three other robberies that were committed soon after the August 18 robbery in the same general geographic area, and that involved substantially similar facts: same time of night, same number of perpetrators; same distinctive clothing on perpetrators; same type of gun used; same method of stealing cash from the register. Nor was the evidence of the uncharged robberies any more inflammatory than the evidence concerning the charged offense, which is the only robbery in which the gun was actually fired and a victim injured.

10

Since we find there was no error in admitting evidence of the uncharged robberies, we do not reach defendant's contentions that the erroneous admission of this evidence was prejudicial and violated his due process rights. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1035 [application of the ordinary rules of evidence generally does not impermissibly infringe on a defendant's constitutional rights]).

## II. Insufficient Evidence of Identity

Defendant contends there was insufficient evidence of identity to support the jury's verdicts. This argument is essentially a reiteration of defendant's argument regarding the admission of the evidence of the uncharged acts: He asserts the details in all the robberies are "common, not unusual or distinctive" and thus do not provide substantial evidence that defendant committed the charged act. We are not persuaded.

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.] [¶] While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light most favorable to the [judgment], and must presume every fact the jury could reasonably have deduced from the evidence. [Citations.] Issues of witness credibility are for the jury." (*People v. Boyer* (2006) 38 Cal.4th 412, 479-480.) For us to set aside the jury's finding that defendant was guilty of the August 18 robbery, "the evidence of identity must be so weak as to constitute practically no evidence at all." (*People v. Lindsay* (1964) 227 Cal.App.2d 482, 493.) The defendant's identity may be proved by "peculiarities of size, appearance, similarity of voice, features or clothing." (*Id.* at p. 494.) "Further, if the record contains substantial evidence from which a reasonable trier of fact could have found the essential elements of the crime proved beyond a

11

reasonable doubt 'the possibility that the trier of fact might reasonably have reached a different conclusion does not warrant reversal.' " (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 564.)

Here, the evidence, including the video footage viewed by the jury and testimony by victims of the charged and uncharged robberies, showed that at approximately the same time of night (just prior to closing) over the course of less than a month, two men (of the same build and wearing very similar distinctive clothing) entered small retail establishments (a small grocery store and different convenience stores) in the greater Sacramento area, the same one man carried the same type of gun (a sawed-off shotgun), he demanded the store employee open the cash register, he took cash directly from the register, and the men left. Evidence also showed that defendant was found shortly after the September 8 robbery in possession of a tracking device stolen during that robbery, was wearing the same clothing as the man who perpetrated the robbery, and was the same build as the man who perpetrated the robbery. This is substantial evidence that defendant was the perpetrator who committed the August 18 robbery as well.

### III. Improper Lay Opinion

Defendant contends that Sacramento County Sheriff's Detective Paul Biondi's testimony that the surveillance videos depicted the same or similar shotgun was improper lay testimony. He argues that because the detective had never seen the actual shotgun involved and did not relay anything specific to this gun as opposed to other sawed-off shotguns, his testimony was not helpful to the jurors. We disagree.

" ' "Lay opinion testimony is admissible where no particular scientific knowledge is required, or as 'a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner.' " ' " (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547.) The opinion must be rationally based on the witness's perception and helpful to a clear

12

understanding of the witness's testimony.  (§ 800.)  By its nature, "the subject matter of lay opinion is 'one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' " (*Chapple*, at p. 547.)  For instance, lay opinion testimony that someone is intoxicated, angry, or driving a motor vehicle at an excessive speed, may be a more convenient or accurate means to convey that information to a jury than providing a detailed recitation of the underlying facts.  (*Ibid.*)  We review the trial court's evidentiary rulings for abuse of discretion.  (*People v. Cowan* (2010) 50 Cal.4th 401, 462.)

Here, over defendant's objection, the trial court permitted Detective Biondi to provide the following lay opinion testimony.  Biondi testified that he reviewed the video from the September 8 robbery, and that in the video he saw an individual with a gun, which he described as a shotgun with "a full stock, a brown fore grip, like a wood fore grip, and it appeared that the front barrel had been sawed off."  Biondi further testified that the gun he saw carried in the video from the August 28 robbery appeared to him to be the same shotgun, and that the video from the August 25 robbery appeared to show "the same individual carrying the same shotgun."  Finally, he testified the shotgun appearing in the footage from the August 18 robbery appeared to him to be similar to the shotgun in the videos from the August 25, August 28, and September 8 robberies.  He came to that opinion because it appeared to him that the gun used in the August 18 robbery and the other robberies had the same size barrel, had the same length barrel, and were the same type of shotgun.  The gun itself was never recovered.

A lay person is permitted to provide opinion testimony identifying a weapon. (*People v. Hines* (1997) 15 Cal.4th 997, 1058.)  Here, by describing the nuanced details of the shotgun he observed in the video of the September 8 robbery, Detective Biondi was able to highlight identifying features of the weapon that another lay person readily could but may not observe.  Thus, Biondi's identification of the firearm in the September

13

robbery was proper lay opinion testimony.  Moreover, his subsequent testimony that it looked like the same gun was used in the August 18, August 25, and August 28 robberies based on his review of the video and photographs from those crimes, was properly permitted as lay opinion testimony.  (See *People v. Maglaya* (2003) 112 Cal.App.4th 1604, 1608-1609 [officer can properly provide lay opinion testimony that shoeprints from crime scene and the pattern on soles of the defendant's shoes are similar].)  The basis and extent of Biondi's knowledge went to the weight of his testimony and was for the jury to decide.  (See *People v. Prince* (2007) 40 Cal.4th 1179, 1229; *People v. Medina* (1990) 51 Cal.3d 870, 887.)  The jury was so instructed.  Therefore, the trial court did not abuse its discretion in permitting Biondi to testify regarding his perception that the weapons used in each robbery were similar.

## IV.  Cumulative Error

Defendant contends the combined prejudice that resulted from the erroneous admission of the evidence of the uncharged crimes and Detective Biondi's lay opinion requires reversal.  Having found no error, we conclude there was no cumulative prejudice meriting reversal.  (E.g., *People v. Dement* (2011) 53 Cal.4th 1, 58; *People v. McWhorter* (2009) 47 Cal.4th 318, 377.)

## V.  Calculation of Credits

As noted above, the trial court awarded defendant 1,892 days of credit when it sentenced him in the instant case.  It calculated this amount by taking the credits awarded by Sacramento County in case No. 08F07444 (753 days) and adding actual and conduct credit for the period following defendant's transfer to Yolo County, which the trial court calculated at 1,139 days (991 days of actual time plus 148 days of conduct credit).  Defendant contends, and the People agree, he is entitled to additional presentence custody credit.  We concur.

14

When the trial court sentenced defendant in this case and resentenced him on the Sacramento County case, defendant was entitled to actual time credit for the time he had already served in the Sacramento County case, i.e., following his conviction in that case and prior to resentencing.  (Pen. Code, § 2900.1; *People v. Buckhalter* (2001) 26 Cal.4th 20, 37.)  He was also entitled to actual time and conduct credit for the time he served in jail prior to the trial on the Sacramento County case.  (*People v. Phoenix* (2014) 231 Cal.App.4th 1119, 1126.)

Defendant was in presentence custody on the Sacramento County case from September 9, 2008, until sentencing on June 25, 2010; he is entitled to 655 days of actual time credit and 98 days of conduct credit for this period.  (Pen. Code, § 2933.1.)  He was then in state prison from June 25, 2010, until July 12, 2011, and in Yolo County jail from July 12, 2011, until sentencing in this case on March 28, 2014; for this period, he is entitled to 1,373 days of actual credit but no conduct credit.  Therefore, defendant is entitled to a total of 2,126 days of credit (98 days of conduct credit and 2,028 days of actual time credit).

## DISPOSITION

The judgment is modified to award defendant 2,126 days of credit (2,028 days of actual time credit and 98 days of conduct credit).  As modified, the judgment is affirmed. The clerk of the trial court is directed to prepare an amended abstract of judgment

15

reflecting the modified award of credits, and to forward a certified copy of the same to the Department of Corrections and Rehabilitation.

         BUTZ         , J.

We concur:

       RAYE        , P. J.

       HULL        , J.