Filed 1/21/25  P. v. Lara CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PATRICK ABENICIO LARA,<br><br>Defendant and Appellant. | F086385<br><br>(Super. Ct. No. 21CMS-0257)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  James T. LaPorte† and Kathy Ciuffini, Judges.‡

Sangeeta Sinha, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

† Retired Judge of the Kings Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

‡ Judge LaPorte presided on May 25, 2023; Judge Ciuffini presided over all other hearings pertinent to this appeal.

Defendant Patrick Abenicio Lara was charged with orally copulating L.M., a child 10 years of age or younger (Pen. Code,[1] § 288.7, subd. (b)). The first trial ended in a mistrial after the jury deadlocked. On retrial, L.M. testified via closed-circuit television pursuant to section 1347. Thereafter, defendant was found guilty as charged and received a sentence of 15 years to life.

On appeal, defendant makes several contentions. First, the trial court's order permitting L.M. to testify via closed-circuit television violated his Sixth Amendment right to confront witnesses. Second, defense counsel rendered ineffective assistance. Finally, the cumulative effect of the foregoing errors was prejudicial. We reject these contentions and affirm the judgment.

## STATEMENT OF FACTS

### I. Prosecution's case-in-chief

a. *Testimony of K.M.*

K.M. is L.M.'s mother. Between 2016 and 2020, K.M. dated defendant and had two sons with him. Although K.M. stopped dating defendant, she would drop off her three children at his residence on "days whe[n] he wasn't working [so] he could watch them for [her] while [she] was working." At the time, defendant lived with his mother, stepfather, sisters, and grandfather.

On January 1, 2021, K.M. was "getting ready to take . . . [L.M.] and the boys over to Patrick's so that he could watch them" when L.M.—who was "nervous," "anxious," and "wanting to cry"—"pulled [her] to the side" and "told [her] she did not want to go." When K.M. asked "what was wrong," L.M. said, "[S]he didn't want to go over there because she didn't like the games that Patrick was playing with her." When K.M. asked L.M. what she meant by "games," L.M. explained, "Patrick would take her into the . . .

_____

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

2.

room downstairs towards the laundry room" and "put[] his private parts in her mouth" "when no one else was around."  K.M. immediately notified the police.

b. *Testimony of L.M.*

At the time of retrial, L.M. was eight years old.  She last saw defendant—whom she called "Patrick" and "Papa"—when she was five years old.  (Boldface omitted.) L.M. and her younger brothers would often stay at defendant's house.  At least a "couple times," defendant brought L.M. to the laundry room, "put a shirt around [her] so [she] didn't see," and inserted "his private part in [her] mouth," "choking [her] with it." Whenever she attempted to leave the room, he "forced [her] to stay."  Defendant gave L.M. "a treat" after he finished.  L.M. testified the abuse made her feel "mad and sad" and she "wanted to punch [defendant] really hard."

On cross-examination, L.M. denied knowing anyone named Frank and saying "Frank is a bad guy."  (Boldface omitted.)

c. *Testimony of Dr. A. Washington*

Dr. Washington, a licensed psychologist, presented an overview of Child Sexual Abuse Accommodation Syndrome (CSAAS), "an educational framework for understanding reactions of children who have been sexually abused and the ways in which children who have been sexually abused might disclose about this abuse experience following abuse."  She identified five categories of CSAAS:  (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, and unconvincing disclosure; and (5) recantation.

## II.  Defense's case-in-chief

a. *Interviews*

The defense played video footage of L.M.'s interviews with (1) Officer Crain of the Hanford Police Department; and (2) S. Bernal of the Multi-Disciplinary Interview Center (MDIC).

3.

### i. Law enforcement interview

In a January 1, 2021 interview with Crain, L.M.—then five years old—identified "Patrick" as "papa." She stated defendant "takes [her] to the hallway" and "put[s] his . . . private part in [her] mouth." This occurred 10 separate times.

### ii. MDIC interview

In a January 16, 2021 interview with Bernal, L.M. stated she has "two parents[, b]ut the bad one . . . is Patrick." She revealed defendant "puts his private part in [her] mouth" and "chokes [her]" "[a]t his house." On more than one occasion, he brought her into a closet where "there's a lot of clothes and stuff," "pulled down his pants," "put his private part in [her] mouth," and "choked [her]." L.M. "tr[ied] to push [defendant]" off, but he "ke[pt] choking [her] and choking [her]" "[w]ith his private."[2] After he finished, he gave her a treat. These incidents, which occurred before Christmas, made L.M. "kind of mad" and "kind of sad."

### b. *Defendant's testimony*

Defendant lived at his grandfather's house alongside his mother, stepfather, and sisters. K.M. and her three children resided there temporarily between June and August 2020. Defendant acknowledged L.M. called him "Papa" but pointed out she also referred to his grandfather and stepfather as "Papa." Defendant identified "Frank" as his "biological father" whom L.M. met several times. For instance, in 2020, Frank visited the house during Christmas "to drop off gifts and send well wishes to the children." Defendant recalled L.M. was "quite upset that day" because "she wanted to be with her mother on the holidays," but K.M. "had . . . been working and not getting as much time with [L.M.] as [L.M.] wanted."

---

[2] Once, when Bernal asked L.M. how she was choked, L.M. replied, "I don't know but – but Frank is just a bad guy." There was no other mention of "Frank" during the interview.

DISCUSSION

## I. Minor's testimony via closed-circuit television

a. *Background*

i. First trial

L.M. was seven years old at the time of the first trial. On the witness stand, she was accompanied by a victim advocate, a therapy dog, and the dog's handler District Attorney Investigator Sozinho. The therapy dog was not visible to the jury. K.M. was also present in the courtroom.

At the outset of direct examination, the following exchange occurred:

"Q. And if I ask you where is your patella, what would you tell me? You are not answering me. [¶] Do you know what a 'patella' is?

"A. No.

"Q. Well, what if I asked you where is your knee, what would you tell me? Do you know where your knee is?

"A. (Shaking head.)

"Q. No?

"A. No. [¶] . . . [¶]

"Q. . . . [¶] . . . [L.M.], what's your favorite animal?

"A. A cat.

"Q. A cat. [L.M.], if I told you my police officer here was wearing a cat suit, would that be true?

"A. Yes.

"Q. Is he wearing a cat suit?

"A. Yes.

"Q. What is he wearing right now?

"A. I don't know. [¶] . . . [¶]

"Q.    Is it okay if I show you some pictures?

"A.    Yeah.

"Q.    All right.  [L.M.], I'm going to show you something, and it says 'Exhibit 1' on the back.  [¶]  Do you know what that photograph is?  [¶]  [L.M.], can you tell me what that shows?

"A.    Numbers.

"Q.    Yeah.  But what's the number on it?

"A.    I don't know.

"Q.    Okay.  Well, let's flip it over.  Thank you.  [¶]  Can you tell me what that shows?

"A.    I see a hallway in there.

"Q.    And have you been in that hallway before?

"A.    Yeah.

"Q.    And where is that hallway?

"A.    In the living room.

"Q.    And whose house is that?

"A.    I don't know.

"Q.    You don't know.  [¶]  You said that you have been in that hallway before?

"A.    Yes.  [¶] . . . [¶]

"Q.    Who else has been at – who were you with when you went to that house?

"A.    I don't know.

"Q.    You don't know.  [¶]  [L.M.], I'm going to show you another photo and this one says 'Exhibit 2' on the back.  Do you recognize that photo?

"A.    Yes.

"Q.    And what is it?

"A.    A living room.

"Q.    Have you been in that living room before?

"A.    Yes.

"Q.    Is that in the same house as that other picture I showed you?

"A.    Yes.

"Q.    I'm going to show you another picture.  This one says 'Exhibit 6' on the back.  [¶]  Do you know what's in that photo?

"A.    A kitchen.

"Q.    Have you been in that kitchen before?

"A.    Yes.

"Q.    Okay.  I want to show you another photo, okay?  This one says 'Exhibit 7' on the back.  [¶]  Do you know what that photo shows?

"A.    No.

"Q.    You don't know that one?

"A.    No.

"Q.    Okay.  One last photo to show you, okay?  This one says 'Exhibit 8' on the back.  [¶]  Can you tell me what that's a photo of?

"A.    The laundry map.

"Q.    The laundry – the what?

"A.    Laundry map.

"Q.    The laundry mat.  Do you have another name for that place?

"A.    No.

"Q.    Okay.  [L.M.], do you know why we are here today?

"A.    No.

7.

"Q. [L.M.], in that photograph that you see there, has anything ever happened that you were not okay with in that room?

"A. Yes.

"Q. Will you tell me about that?

"A. No.

"Q. What was that?

"A. No.

"Q. And why not, [L.M.]?

"A. What?

"Q. And why can't you tell me about that?

"A. I don't know. [¶] . . . [¶]

"Q. [L.M.], you told me that something happened to you in that room that you were not okay with. Will you tell me what happened in that room?

"A. No. [¶] . . . [¶]

"Q. [L.M.], tell me what happened in that room that you were not okay with?

"A. Can I take a break?

"Q. Yes, of course." (Boldface omitted.)

A 10-minute recess was taken. Outside the presence of L.M. and the jury, the prosecutor mentioned:

"I did just speak with [K.M.] and basically asked her what was going on. [K.M.] let me know that [L.M.] is too scared of the Defendant. So I'm just going to ask the Court allow me to have [L.M.] basically face the Court while she testifies so that she doesn't have to be facing him.

"I believe the Court – I believe this is appropriate because she would still be available for cross-examination, the jury could still see her facial expressions, and there would be no constitutional right violated. This is

8.

merely for the emotional wellbeing of the 7 year old girl, so she doesn't have to face out."

Defense counsel "submit[ted] to the Court's broad discretion" and the court granted the request.

L.M. retook the witness stand.  The following exchange occurred:

"THE COURT:  All right.  Hi, [L.M.].  Did you have a good break?

"THE WITNESS:  Yeah.

"THE COURT:  Yes or no?

"THE WITNESS:  Yes.

"THE COURT:  How are you feeling?

"THE WITNESS:  Good.

"THE COURT:  Yeah.  You – all right.  [The prosecutor] is going to ask some more questions.  Are you okay?

"THE WITNESS:  Yes.

"THE COURT:  You look like you are about ready to cry.  Are you okay?

"THE WITNESS:  (Nodding.)

"THE COURT:  You know you are safe in here, right?

"THE WITNESS:  Yeah.

"THE COURT:  So I have – I have a bailiff, . . . and he has – he takes care of the safety in the courtroom.  You understand that, right?

"THE WITNESS:  Yeah.

"THE COURT:  Okay.  I just want to make sure you are very safe in here.  And then we also have Ms. [Sozinho], she's a police officer too, and she takes care of the safety of the courtroom as well.  You understand that?  And she's standing right next to you.  All right?

"THE WITNESS:  Uh-huh.

9.

"THE COURT: What did you say?

"THE WITNESS: Yes.

"THE COURT: Okay. So you are okay. You are going to be okay today. All right?

"THE WITNESS: Okay.

"THE COURT: All right. Don't be – don't be afraid of anything. There's – I know this is a really different type of place to be, but there's nothing to be scared of. I come here every day and I'm not scared. All right?

"THE WITNESS: All right.

"THE COURT: Nothing in this room scares me, all right?

"THE WITNESS: Yes."

After the jury reentered the courtroom, direct examination resumed:

"Q.    [L.M.], are you doing all right?

"A.    Yes.

"Q.    Now is the time to be brave, okay?

"A.    Okay.

"Q.    [L.M.], do you remember speaking with a nice young lady with a dog in the room?[3]

"A.    Yes.

"Q.    Do you remember how she told you that I don't have all the answers, you have all the answers?

"A.    Yes.

"Q.    And today you have all the answers, okay?

"A.    Okay.

---

[3] The prosecutor was referring to the January 16, 2021 MDIC interview with Bernal.

"Q. And I'm just asking the questions, and I wasn't there, so I don't know what happened. So you have to tell me what happened. Okay?

"A. Okay.

"Q. Okay. Now we're going to talk about what happened in that room.

"A. Okay.

"Q. Okay. Tell me what happened in that room?

"A. Um – um – [¶] . . . [¶]

"Q. Let's start small. Was there anyone else in that room with you when this thing happened?

"A. (Nodding.)

"Q. Tell me who that person was?

"A. Patrick.

"Q. Okay. And what were you doing in that room?

"A. Choking me.

"Q. Who was choking you?

"A. Patrick.

"Q. And what was he choking you with?

"A. Nothing. With his hands.

"Q. What were his hands doing?

"A. Around my neck.

"Q. Okay. Did you have clothes on?

"A. Yeah.

"Q. And did that ever change?

"A. No.

11.

"Q. Okay. Did Patrick have clothes on?

"A. Yes.

"Q. What clothes did he have on?

"A. I don't know.

"Q. Okay. And did those clothes – did Patrick's clothes ever come off?

"A. No.

"Q. No? And, [L.M.], tell me how you got into that room?

"A. He took me in there.

"Q. Okay. And so what was the first thing that happened after he took you into that room?

"A. I don't know.

"Q. You don't know? What's the first thing that you remember that happened once you – he took you into that room?

"A. I don't remember.

"Q. You don't remember?

"A. (Shaking head.)

"THE COURT: [L.M.], there's some water right next to you. Why don't you take a drink of that water, all right? It's not flavored water, it's just regular water. All right?

"THE WITNESS: All right.

"THE COURT: Do you feel better?

"THE WITNESS: (Nodding.)

"THE COURT: All right. So go ahead and answer [the prosecutor]'s questions, and you can use your words to do that. [¶] . . . [¶]

"THE WITNESS: Okay. [¶] . . . [¶]

12.

"Q.    [L.M.], tell me everything that you could hear when Patrick was choking you?

"A.    I didn't hear anything.

"Q.    I couldn't hear that, [L.M.].  I'm sorry.  Could you speak up for me, please?

"A.    I didn't hear anything.

"Q.    You didn't hear anything?

"A.    No.

"Q.    Tell me everything that his body was doing?

"A.    I don't know.

"Q.    You don't know?

"A.    No.

"Q.    Tell me everything that your body was doing?

"A.    Nothing.

"Q.    How did you feel when he was choking you?

"A.    Not good.

"Q.    I'm sorry, [L.M.].  I couldn't hear you.  Could you speak up, please?

"A.    Not good.

"Q.    Not good?

"A.    No.

"Q.    How long were you in that room with him?

"A.    I don't know.

"Q.    You don't know.  [¶]  And what happened after he was choking you?

"A.    I don't know.

13.

"Q. You don't know. [¶] And, [L.M.], how long ago was this?

"A. I don't know.

"Q. Are you having some trouble remembering?

"A. Yes.

"Q. Do you remember when – you said you remember speaking with that nice young lady with the dog in the room?

"A. Yeah.

"Q. Do you think it might help your memory if you watched a video of that?

"A. Um, no.

"Q. You don't think so?

"A. (Shaking head.)

"Q. Do you think it's possible that watching a video of that might help you remember what happened?

"A. No.

"Q. No? And so, [L.M.], you do remember that Patrick took you in that room. Right?

"A. Yes.

"Q. And then just the next thing you remember is that he was choking you.

"A. Yes.

"Q. And what did you say he was choking you with?

"A. His hands.

"Q. His hands. And do you remember what happened after that?

"A. No.

"Q. How did it end?

14.

"A. I don't know.

"Q. You don't know. You don't know how – do you remember leaving that room?

"A. Yes.

"Q. How did you leave that room?

"A. I don't know.

"Q. [L.M.], you look a little sad right now. Are you doing okay?

"A. No.

"Q. How do you feel right now?

"A. Not good.

"Q. Not good. Why is that?

"A. I want to take a break.

"Q. Okay." (Boldface omitted.)

Another recess was taken. Outside the presence of L.M. and the jury, the court remarked:

"So when we came back from the break and I was questioning [L.M.] right before she started answering the questions her lips were trembling, she – she appears scared to me, her voice was trembling when she was answering the questions. She has a locked in stare, I think that's the only way I can describe it. She just looks very scared.

". . . . I think she grabbed a Kleenex. She was crying. I could hear the phlegm in her mouth."

The prosecutor added: "Yes, your Honor. And before the jury came in she was just staring at me, would not break eye contact."

L.M. retook the witness stand. The following exchange occurred:

"THE COURT: . . . . [¶] All right. Are we ready to go?

"THE WITNESS: Yes.

"THE COURT: You feel a little bit better?

15.

"THE WITNESS:  Yeah.

"THE COURT:  You look better.  All right."

After the jury reentered the courtroom, direct examination resumed:

"Q.    [L.M.], do you remember talking to me last week?

"A.    Yes.

"Q.    And do you remember I showed you that photo last week?

"A.    Yes.

"Q.    Do you remember calling that place 'the scary room'?

"A.    Yes.

"Q.    [L.M.], do you remember way back when you talked with that nice young lady and the dog was in the room, do you remember that?

"A.    Uh-huh.

"Q.    And do you remember saying that Patrick was the bad guy?

"A.    Yes.

"Q.    And do you see Patrick in the courtroom?

"A.    Yes.

"Q.    I just need you to look at him once.  Will you point at him and tell me what shirt he's wearing and what color it is?

"A.    Blue.

"Q.    Okay.

"THE COURT:  For the record, she's pointed in the direction of the Defendant and the Defendant is wearing a blue shirt.  Thank you.
[¶] . . . [¶]

"Q.    And, [L.M.], do you remember telling that lady that Patrick choked you with is private part?

"A.    Yes.

"Q. Sorry, I couldn't hear. What was that?

"A. Yes.

"Q. And do you remember telling that lady that you felt mad and sad?

"A. Yes.

"Q. [L.M.], are you scared right now?

"A. Yes.

"Q. All right. Thank you, [L.M.]. I don't have any more questions." (Boldface omitted.)

A lunch break followed L.M.'s testimony. Outside the presence of L.M. and the jury, the prosecutor moved to admit into evidence video footage of the January 16, 2021 MDIC interview. Defense counsel did not object and the court granted the motion. The jury subsequently watched the footage. Ultimately, it could not reach a unanimous verdict[4] and the court declared a mistrial.

ii. Motion for closed-circuit testimony

Before retrial, the prosecution filed a motion to allow K.M. to testify via closed-circuit television pursuant to section 1347. The motion detailed:

"The court was present when L.M.—seven years old at the time—testified and, as the transcript would reflect, L.M. had significant difficult[y] even responding to initial competency questions. L.M. needed multiple breaks due to the significant stress. Witnesses to L.M.'s demeanor outside of the courtroom during those breaks could testify at [an Evidence Code section] 402 hearing that L.M. was crying outside and was scared of the defendant. Accommodations were made for both attorneys to stand near the court reporter because L.M. was too scared to look in the defendant's direction. L.M. was not able to describe anything that happened to her with specificity and testified that she was scared. L.M. eventually agreed with leading questions that the defendant sexually touched her but could not describe

---

[4] The jury foreperson specified the jury deadlocked eight-to-four in favor of conviction.

17.

any facts as she had described in the MDIC [interview] that was eventually played for the jury under Evidence Code [section] 1360."

At an April 21, 2023 hearing, the trial court received transcripts of L.M.'s and K.M.'s testimonies at the first trial and agreed to hold an Evidence Code section 402 hearing "to hear the testimony of any relatives or [K.M.] regarding what happened outside the courtroom." On April 24, 2023, K.M. testified at the Evidence Code section 402 hearing. On direct examination, the following exchange occurred:

"Q.      . . . [A]t one point did [L.M.] disclose that someone had touched her inappropriately?

"A.      Yes.

"Q.      And were you present – was there a jury trial previously to today with those – about those allegations?

"A.      Yes, at the last – at the last hearing.

"Q.      And were you present at that jury trial?

"A.      Yes.

"Q.      And were you present when [L.M.] was testifying?

"A.      Yes.

"Q.      Did [L.M.] have to take some breaks and go outside of the courtroom?

"A.      Quite a few.

"Q.      Were you present during those breaks?

"A.      Yes.

"Q.      Can you tell us about her demeanor and anything she would have said to you during these breaks?

"A.      When she was with me she was expressing that she was scared, frightened, uncomfortable to be around him, and that she didn't feel safe being in the same room as him and that she even felt wrong.

"Q.      And when you say 'him' did she say who she meant?

18.

"A.    Patrick.

"Q.    Can you tell us about how – what her voice was like, what her face was like while she was telling this to you?

"A.    She was crying. She looked just defeated and sad. And she just was like begging to – to leave because she couldn't stand to be around him." (Boldface omitted.)

On cross-examination, the following exchange occurred:

"Q.    You testified that [L.M.] was begging – begging to leave. Can you – do you remember exactly what words she used?

"A.    She said 'mommy I don't want to be here anymore. Can we please go home? This is making – this is making me feel scared.' And other – and a few other things similar to that. [¶] . . . [¶]

"Q.    . . . . So are you the person who brought her to the courthouse?

"A.    Her dad drove her to the courthouse and I met them here.

"Q.    Okay. So was she living with her dad at that time?

"A.    Yeah, we have split custody. . . . [¶] . . . [¶]

"Q.    Since – since the end of the trial last September have you affirmatively asked [L.M.] any questions about how she feels about testifying again?

"A.    She expressed to me and her father that she was too scared to come back – that she's too scared to come back to court.

"Q.    Okay. . . . [D]id you affirmatively ask her how she feels about testifying again? Did you . . . ask her yourself how she feels?

"A.    Yes, sir.

"Q.    Okay. How many times?

"A.    A couple times. I try not to stress her out too much about it.

"Q.    And approximately when were those couple times?

"A.     Once was about a week ago and maybe the other one was about a month ago.

"Q.     Okay.  And what was the reason that you asked?  How did it come up as something that you would even ask her about?

"A.     I sat her down and told her something big was coming up and that we needed to prepare and talk about it and I asked her how she felt about it and if she was comfortable coming back.

"Q.     Okay.

"A.     Just to kind of get a sense of where she's at.  [¶] . . . [¶]

"Q.     Do you have any information about how [L.M.] feels about coming to court other than [L.M.]'s answers to your two – two questions?

"A.     She has expressed to her dad that she's scared as well, and beyond that nobody else has spoken to her about it.

"Q.     Okay.  How do you know she has expressed that to her dad?

"A.     Her dad communicated that with me.

"Q.     Did he communicate that to you on one occasion or more than one occasion?

"A.     More than one occasion."  (Boldface omitted.)

On redirect examination, the following exchange occurred:

"Q.     So you told us earlier that during the trial [L.M.] told you she was scared of the Defendant, and then when you asked her after the trial about going back you said she was too scared to come back to court.  Did she explain which – or did you ask her why or what she was scared of?  Or did she explain?

"A.     She told me that – that she was too scared to be in the same room as Patrick because what he did made her feel wrong and she felt scared like she was in danger."  (Boldface omitted.)

The court further questioned K.M.:

"THE COURT:  . . . .  [¶]  [K.M.], when your daughter [L.M.] testified were you in the courtroom at all times?

20.

"THE WITNESS:  Yes, ma'am.

"THE COURT:  All right.  As – as her mother, when she first took the stand, did you make any observations about her demeanor –

"THE WITNESS:  Yeah.

"THE COURT:  – as to how she was testifying?

"THE WITNESS:  I had never seen her feel so anxious and scared. It was pretty upsetting to see like how upset she was.

"THE COURT:  Okay.

"THE WITNESS:  She was like visibly like shaking and scared and just nervous, like she couldn't even get full sentences out and that's pretty unlike her.

"THE COURT:  And – okay.  So after we – we took a break, and then I think she went outside.  And can you describe her demeanor – actually, strike that.  [¶]  Did you speak with her during that break?

"THE WITNESS:  Yeah.

"THE COURT:  And who else was present when you spoke with her?

"THE WITNESS:  So there was a few times where I spoke to her alone and then the other times it was her dad and her stepmother . . . that came also to comfort her when she was outside.

"THE COURT:  And that's when she said the things that you testified about?

"THE WITNESS:  Yeah, a few times it was just alone to me and her – her dad can also testify to what she said as well.

"THE COURT:  Okay.  And then when she returned back into the courtroom to testify did you make any observations about her demeanor, you know, as – as her mother?

"THE WITNESS:  Yeah, I could tell she was trying to be strong, but that she – she just still felt really scared."

21.

Thereafter, the court listened to counsels' arguments. It pronounced:

"Okay. So in a situation where the child has never testified, the Court would have no evidence before it that the child would suffer serious emotional distress to become unavailable as a witness unless the child were examined, let's say, by a mental health practitioner . . . .

"Our situation is really quite different. Our situation is we have had a jury trial, the child came into the courtroom . . . . [¶] . . . [¶] [She had] a court tour. And then she actually sat at the witness stand, which is approximately maybe 10 to 15 feet away from me, and so I was able to observe her the whole time during her testimony. And I – for purposes of this hearing, I did review her testimony from September 14th. I also reviewed the MDIC testimony because I was given a copy of the MDIC transcript when it was played.

". . . . In the transcript of her testimony on September 14th, what I noticed and what I – as I was reading the transcript I had remembered, it was refreshing my memory of her testimony, and [the prosecutor] had started out with showing her photographs. And she remembered a photograph in Exhibit 1, 2, 6, didn't remember Exhibit 7, remembered Exhibit 8, which was the laundry – she called it a 'laundry map.' And [the prosecutor] had asked her 'tell me what happened, can you?' And she said 'no.' And then [the prosecutor] then asked her 'will you tell me about that?' And so a child of that age takes everything very literal. 'Will you tell me, [L.M.], what happened' giving her the opportunity either to tell or not tell. And her response was very indicative of a child of that age, who doesn't want to appear – it appeared to me that she did not want to talk because she said 'no.' [¶] . . . [¶]

"So my understanding of the – where the alleged assault occurred was in the laundry room where the Defendant's room was. And so I think that was the photograph Exhibit 8 and the question was '[L.M.] tell me what happened in that room that you were not okay with?' And she immediately states 'can I take a break?' And we allowed her to take a break. To me that's an indication that the child was probably instructed that if she needs to take a break she can take a break. I think I may have instructed her, I'm not sure. But it's clear that she needed to take a break from something.

"And a picture of the laundry room where the alleged incident had just been shown to her. So it was – it was probably triggering something. And I – you know, maybe I'm speculating, I don't know. I think it's a

reasonable inference that I can make. We let the jury out, and then, [the prosecutor] . . . went to speak to [K.M.] and . . . said 'I just went to speak with [K.M.], basically asked her what was going on. [K.M.] let me know that [L.M.] is too scared of the Defendant' so that was right after she asked to take a break. 'So I'm just going to ask the Court to allow me to have [L.M.] basically face the Court while she testifies.' And so that's when we changed the arrangement in the courtroom for the questioning.

"Thereafter, I – I do remember making the comment about her – trying to assure her of her safety and the comment about her demeanor.

"And so our situation as I stated it, it's very different from a situation where a child has never confronted the Defendant. She has confronted the Defendant and she for all intents and purposes and the Court is making inferences, she had a breakdown, which is consistent with a child suffering serious emotional distress.

"Six months – and, . . . I appreciate [defense counsel's] comments about the timeframe, six to seven months is a very long time, I understand what you are saying. But then we also have the testimony of [K.M.] that within at least a week and/or a month she's had conversations with her daughter and her daughter is still afraid of the Defendant.

"So I do find, first of all, that an alleged sexual offense allegedly has been committed against the minor and it is one described in [section] 1347. I do find there's clear and convincing evidence that is so substantial to make the minor unavailable as a witness because she did suffer serious emotional distress and she was – for all intents and purposes she was unavailable as a witness. [The prosecutor] had to play the MDIC interview because of that unavailability. And what I mean by 'unavailability' is that she was refusing – she testified some, but she was refusing to testify to some things. [¶] . . . [¶]

"And I do agree that the way to proceed is by two way closed circuit television. . . ."

iii. Retrial

Prior to L.M.'s testimony on retrial and outside the presence of the jury, the court "state[d] a couple things for the record":

". . . . [L.M.] told her mother that she didn't want to go over to the Defendant's house. She described things the Defendant was doing to her

23.

and she didn't like what he was doing to her and there was a reference to 'treats,' but that was not clear from the testimony.

"She was too scared to tell her mom because she thought she was going to be in trouble and [L.M.] eventually made a disclosure of some kind of sexual assault occurring. [L.M.] did not want to go back to the house because she didn't want him to continue doing that to her, sexually assaulting her.

"While talking to [L.M.], [K.M.] described [L.M.] as being afraid, nervous, upset, and confused and this is from the – from the transcript of the testimony. She was five years old at the time that [L.M.] disclosed this. She was not acting like herself, which [L.M.] is a very happy girl, this is as described by [K.M.]. She was crying and she was not happy. [¶] . . . [¶]

"At the time of the trial [L.M.] was 7 years old. [L.M.] and the Defendant did not have a close relationship, at least the testimony did not reflect that. The Defendant is her brothers' father. . . . The Defendant would occasionally watch her with her brothers and was not a constant in her life.

"At the trial the Prosecutor showed her photographs of the Defendant's house. Her responses upon being shown photographs, of the house especially Exhibit Number 8 were 'I don't know.' She said that several times. And during the course of her testimony, it appears as if she was deteriorating, that was my impression of her.

"Then when she was asked about something bad happening to her in the room depicted in Exhibit 8, she refused to answer those questions. The Prosecutor stated 'will you tell me about that,' he asked her two times and each time she said 'no.' She refused to answer the question.

"And then . . . I think we took a break. The Prosecutor then asked 'tell me what happened in that room that you are not okay with.' At that point she asked to take a break and we took a break. She met with her mother outside. . . . [The prosecutor] stated that he asked the mother what was going on at the break [L.M.] was with her family.

"Yesterday [K.M.] testified about the – those conversations that she had with [L.M.] at that break. And she testified that the – that [L.M.] was scared of the Defendant and did not want to return back into the courtroom. She was crying according to [K.M.].

24.

"[The prosecutor] then asked [K.M.] what was going on and was told [L.M.] is too scared to testify because of the Defendant and I think [the prosecutor] expressed that to the Court. At that point we made different arrangements in the courtroom, Counsel stood behind the court reporter, I think on her left-hand side behind the podium asking her questions because it was stated that [L.M.] did not . . . want to look at [defendant], it was asked whether she could look at me, and I suggested that having the attorneys move.

"When she came back into the courtroom I made the observation to her 'you look like you are about ready to cry.'

"There are numerous procedures the Court can use to make a child witness feel comfortable. At the prior trial in September we used most of those procedures. The victim was allowed to have two support persons present when she was testifying, she had her mother and she also had [the victim advocate]. The victim was allowed to have a comfort dog with her at the witness stand, we also had [District Attorney Investigator] Sozinho, who is a peace officer. We took frequent breaks for her. We allowed the attorneys to change their positions within the courtroom so that she would not have to look at the Defendant. I allowed – at one point I allowed the attorneys to ask leading questions of [L.M.], which is within my discretion.

"At one point, and it is described in the – in the transcript of the testimony, she had a complete breakdown and I described it. So when we came back from the break and I was questioning [L.M.] right before she started answering the questions, her lips were trembling, she appeared scared to me, her voice was trembling when she was answering the questions. . . . [S]he has a locked in stare, I think that's the only way I can describe it, she just looks very scared. She grabbed a Kleenex, she was crying, and I can hear phlegm in her mouth.

"Another alternative procedure to protect the rights of the child witness as well as the Defendant and the integrity of the judicial process is to allow two way closed circuit TV to be used. The minor's testimony does involve an alleged sexual offense committed on or with the minor pursuant to [section] 1347(b)(1) capital (A).

"Based on the prior testimony of the child, the Court's observations of her as described in the prior record, the mother's testimony about the victim's fear of the Defendant at the prior trier – trial and her stated fear to the mother last month and within one week from today, I do find there's clear and convincing evidence that requiring the minor to testify in the presence of the Defendant will result in the child suffering serious

25.

emotional distress, so that she would be unavailable as a witness. And as I stated yesterday, I felt that what we observed her to be experiencing at the last trial was serious emotional distress.

"I have considered the age of the minor at the time of the prior trial, which was 7, and I believe she's . . . 8 right now[.] [¶] . . . [¶] . . . . I have considered the nature of the charges. The nature of the charges are more invasive than a touching over the clothes. This involves the Defendant placing his penis in the mouth of the child, which is very invasive and could be shockingly frightening to a child. I have also considered the relationship between the Defendant and the child, there's really no blood relationship, it's not close.

"And for the – all of those reasons I am ordering the closed circuit two way television. I just – I wanted to clarify the record and I was waiting to also see how [L.M.] would respond this morning."

L.M. was brought to the judge's chambers, where a camera was set up. After the jury entered the courtroom, the court instructed:

"Okay. So, Ladies and Gentlemen, I do have – I have an instruction to give you.

"The testimony of [L.M.] will now be presented to you by way of closed circuit television. Do not draw any inferences from that fact. Evaluate that testimony by the same standards and in the same way that you evaluate the other testimony given in this trial. Do not speculate as to the reason for this procedure. Do not be bias[]ed for or against any witness or party because testimony is presented in this manner."

L.M. testified from the judge's chambers. Afterward, a recess was taken. Outside the presence of L.M. and the jury, the court remarked:

"Okay. So I just would – for the record I just want to make the observation of the comparison of the testimony between [L.M.] today and [L.M.] at the last hearing. She was – appeared very calm, very talk – much more talkative than the last time. I didn't see any tears. I saw very little emotion. She looked a little bit nervous at the very beginning, but other than that she – she appeared to do extremely much better than last time."

Defense counsel noted:

"Your Honor, my – my hesitation frankly is only with the phrase 'did much better.' [¶] . . . [¶] . . . The way I would say it is – the way I would

26.

say it is today the – the child witness was able to answer almost all if not all of the questions from both [the prosecutor] and myself. And it's clear from the record that last time she was not. And the other – the other observations I submit are complete for the record."

The prosecutor added:

"[T]he first time she came she stuttered, she just couldn't answer certain things. . . . [S]he was younger but that was only a year ago. And her demeanor was quite different this time, she answered the questions that she was asked. When she couldn't hear, she told us she couldn't hear. She didn't have to take a break. And there was no indication that she was crying or begging not to come in from the time that she got here until the time that she left as there was for [K.M.]'s testimony to that for the [Evidence Code section] 402 hearing."

b. *Pertinent law*

" 'The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, [citation], provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." . . . [I]t guarantees a defendant's right to confront those "who 'bear testimony' " against him.' [Citation.]" (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1281 (*Powell*).) "The confrontation clause not only affords defendants the right to personally examine adverse witnesses, it also ' "(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." [Citation.] [¶] The combined effect of these elements of confrontation . . . serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings. [Citations.]' " (*In re Ruedas* (2018) 23

Cal.App.5th 777, 786, quoting *Maryland v. Craig* (1990) 497 U.S. 836, 845–846 (*Craig*).)

The confrontation right "is not so absolute . . . that it always requires the accuser and accused to be in the same room." (*Powell*, *supra*, 194 Cal.App.4th at p. 1281.) " '[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 701 (*Arredondo*), quoting *Craig*, *supra*, 497 U.S. at p. 850.)

"[T]he United States Supreme Court held that 'a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court.' " (*Powell*, *supra*, 194 Cal.App.4th at p. 1281, quoting *Craig*, *supra*, 497 U.S. at p. 853.) "[U]pon 'an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.' " (*Arredondo*, *supra*, 8 Cal.5th at p. 701, quoting *Craig*, *supra*, at p. 855.) " '[T]he requisite finding of necessity must . . . be a case-specific one: The trial court must hear evidence and determine whether use of the [alternative] procedure is necessary to protect the welfare of the particular child witness who seeks to testify. [Citations.]' " (*Arredondo*, *supra*, at p. 702, quoting *Craig*, *supra*, at pp. 855–856.) In addition, "[a]n adequate showing that the defendant's presence may cause emotional trauma is required: 'The trial court must . . . find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant.' " (*Powell*, *supra*, at p. 1283, quoting *Craig*, *supra*, at p. 856.)

" '[W]here necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation.' " (*Arredondo*, *supra*, 8 Cal.5th at pp. 701–702, quoting *Craig*, *supra*, 497 U.S. at p. 857.) A procedure may provide sufficient assurances where it preserves the other elements of the confrontation right, e.g., " '[t]he child witness must be competent to testify and must testify under oath' "; " 'the defendant retains full opportunity for contemporaneous cross-examination' "; and " 'the judge, jury, and defendant are able to view . . . the demeanor (and body) of the witness as he or she testifies.' " (*Arredondo*, *supra*, at p. 701, quoting *Craig*, *supra*, at p. 851; accord, *People v. Bharth* (2021) 68 Cal.App.5th 801, 815; see *Craig*, *supra*, at p. 851 ["Although we are mindful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation – oath, cross-examination, and observation of the witness' demeanor – adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony."].)

"In section 1347, the Legislature sought to make closed-circuit television testimony available to child witnesses under circumstances that, in the lawmakers' view, would preserve a defendant's Sixth Amendment confrontation rights as outlined in *Craig*." (*Powell*, *supra*, 194 Cal.App.4th at p. 1282.) Section 1347, subdivision (a) provides:

> "It is the intent of the Legislature in enacting this section to provide the court with discretion to employ alternative court procedures to protect the rights of a child witness, the rights of the defendant, and the integrity of the judicial process. In exercising its discretion, the court necessarily will be required to balance the rights of the defendant or defendants against the

need to protect a child witness and to preserve the integrity of the court's truthfinding function. This discretion is intended to be used selectively when the facts and circumstances in an individual case present compelling evidence of the need to use these alternative procedures."

Section 1347, subdivision (b) provides in pertinent part:

"Notwithstanding any other law, the court in a criminal proceeding, upon written notice by the prosecutor made at least three days prior to the date of the preliminary hearing or trial date on which the testimony of the minor is scheduled, or during the course of the proceeding on the court's own motion, may order that the testimony of a minor 13 years of age or younger at the time of the motion be taken by contemporaneous examination and cross-examination in another place and out of the presence of the judge, jury, defendant or defendants, and attorneys, and communicated to the courtroom by means of closed-circuit television, if the court makes all of the following findings:

"(1) The minor's testimony will involve a recitation of the facts of any of the following: [¶] (A) An alleged sexual offense committed on or with the minor. [¶] . . . [¶]

"(2) The impact on the minor of one or more of the factors enumerated in subparagraphs (A) to (E), inclusive, is shown by clear and convincing evidence to be so substantial as to make the minor unavailable as a witness unless closed-circuit testimony is used. [¶] (A) Testimony by the minor in the presence of the defendant would result in the child suffering serious emotional distress so that the child would be unavailable as a witness. [¶] . . . [¶]

"In making the determination required by this section, the court shall consider the age of the minor, the relationship between the minor and the defendant or defendants, any handicap or disability of the minor, and the nature of the acts charged. The minor's refusal to testify shall not alone constitute sufficient evidence that the special procedure described in this section is necessary to obtain the minor's testimony.

"(3) The equipment available for use of closed-circuit television would accurately communicate the image and demeanor of the minor to the judge, jury, defendant or defendants, and attorneys."

c. *Standard of review*

"In accordance with th[e] statutory language [of section 1347, subdivision (a)], the applicable standard of review for the trial court's order allowing [the child witness] to testify via closed-circuit television is abuse of discretion." (*Powell*, *supra*, 194 Cal.App.4th at p. 1283.) "[I]n determining whether the court abused its discretion, we look for substantial evidence in support of its finding." (*Id.* at p. 1284, fn. 6.)

Under section 1347, subdivision (b)(2), "[t]he court must find that '[t]he impact on the minor . . . is shown by clear and convincing evidence to be so substantial as to make the minor unavailable as a witness unless closed-circuit testimony is used.' " (*Powell*, *supra*, 194 Cal.App.4th at p. 1284, fn. 6.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011; see *id.* at p. 1006 ["Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' "].) "[A]n appellate court reviewing a finding made pursuant to the clear and convincing standard does not reweigh the evidence itself.  In assessing how the evidence reasonably could have been evaluated by the trier of fact, an appellate court reviewing such a finding is to view the record in the light most favorable to the judgment below; it must indulge reasonable inferences that the trier of fact might have drawn from the evidence; it must accept the fact finder's resolution of conflicting evidence; and it may not insert its own views regarding the credibility of witnesses in place of the assessments conveyed by the judgment." (*Id.* at p. 1008; see *People v. Vivar* (2021) 11 Cal.5th 510, 528, fn. 7 ["[W]hen reviewing a [finding] under the substantial evidence standard, 'an appellate court should defer to the factual determinations made by the trial court.' "].)

31.

d. *Analysis*

The record—viewed in the light most favorable to the ruling—contains substantial evidence that it was highly probable defendant's physical presence in the courtroom would cause L.M. such serious emotional stress as to make her unavailable as a witness at retrial without the aid of closed-circuit television.

At the first trial, prior to testifying, L.M. toured the courtroom. On the witness stand, she was accompanied by a victim advocate, a therapy dog, and the dog's handler (who was also a peace officer and district attorney investigator). When direct examination commenced, however, L.M. could not answer straightforward questions such as the location of her knee or whether an officer in the courtroom was wearing a "cat suit." She was shown photographs of the interior of defendant's residence and recognized the hallway, living room, and laundry room, but she denied knowing to whom the house belonged. L.M. said "[y]es" when asked if "anything ever happened that [she] [was] not okay with in [the laundry] room," but she frequently refused to specify what had transpired and requested a break. The court, which "was able to observe" L.M. from "approximately maybe 10 to 15 feet away," deduced the photograph of the laundry room "probably trigger[ed] something" and believed L.M. "was deteriorating." K.M., who was present in the courtroom, thought L.M. was "anxious," "scared," and "visibly . . . shaking" and her daughter's inability to speak as "unlike her."

During the break, L.M. cried and "looked just defeated." She repeatedly told K.M. she was afraid of defendant, did not feel safe in the courtroom with him, and wanted to leave. K.M. relayed these comments to the prosecutor, who—in turn—informed the court. Consequently, L.M. would be allowed to "basically face the Court while she testifies so that she doesn't have to be facing [defendant]."

When L.M. returned to the stand, the court noticed she was "about ready to cry" and "her lips were trembling." At some point, she "grabbed a Kleenex" and the court "could hear the phlegm in her mouth." The court tried to placate L.M.'s security

32.

concerns by pointing out law enforcement officers in the room. Nevertheless, when direct examination resumed, L.M. had "a locked in stare" and "would not break eye contact" with the prosecutor. Her voice shook as she answered questions and the prosecutor often could not hear her responses right away. K.M. saw L.M. "was trying to be strong" but remained "really scared." L.M. recalled being interviewed by Bernal. She verified defendant brought her to the laundry room and "chok[ed] [her]" "[w]ith his hands," which made her feel "[n]ot good," but she maintained she could not remember or did not know other details. L.M. did not want to watch the video footage of her MDIC interview, insisting such footage would not refresh her memory. The prosecutor pointed out L.M. looked "a little sad right now" and asked whether she was "doing okay." She replied, "No." When the prosecutor asked why, L.M. requested another break. The court opined L.M. was suffering "a complete breakdown."

When L.M. once again returned to the stand, the court allowed the prosecutor to ask leading questions. L.M. subsequently affirmed she called defendant's laundry room " 'the scary room' " and told Bernal defendant was "the bad guy," he "choked [her] with his private part," and she "felt mad and sad." L.M. was able to identify defendant in the courtroom by pointing her finger at him. She admitted she was still afraid and the prosecutor ended the questioning. At the Evidence Code section 402 hearing, K.M. testified she spoke to L.M. about testifying at retrial "about a week ago" and "about a month ago" and L.M. revealed she was "too scared to come back."

In finding clear and convincing evidence L.M. would be traumatized by defendant's presence in the courtroom at retrial and use of closed-circuit television was necessary to protect her welfare, the court primarily cited L.M.'s testimony at the first trial, its observations of L.M.'s demeanor thereat, and K.M.'s testimony at the Evidence Code section 402 hearing. In view of section 1347, subdivision (b)(2), the court also considered L.M.'s age, the "invasive" nature of the charged sex offense, and the lack of a "blood relationship" between L.M. and defendant.

33.

On appeal, defendant questions the court's reliance "upon its lay observations of L.M. during her testimony in the first trial and [K.M.]'s testimony that L.M. expressed fear of [defendant] during her prior testimony and that she continued to express that fear as the second trial approached." Case law, however, clearly establishes the substantial evidence standard of review may be satisfied by a trial court's own observations (see *People v. Fairbank* (1997) 16 Cal.4th 1223, 1254) and/or the testimony of a single witness (see *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052). Next, defendant claims "[t]he present case is troubling in that the prosecution presented no expert evidence in support of its motion to have L.M. testify remotely." Yet, nothing on the face of section 1347 mandates an expert's opinion. (See *People v. Boyd* (1979) 24 Cal.3d 285, 294 ["[W]hen the Legislature intends otherwise, it expresses its purpose in unmistakable words."].) Finally, defendant alleges the court improperly deemed L.M. " 'unavailable as a witness' merely because she recanted or testified in a manner the court assumed was untruthful." (Underlining omitted.) He specifically refers to the following remark made by the court at the time it granted the prosecution's motion for closed-circuit testimony: "And what I mean by 'unavailability' is that she was refusing – she testified some, but she was refusing to testify to some things." In our view, the court's statement in context did not allude to any inconsistency or falsity of L.M.'s testimony at the first trial. Rather, the court simply expressed that L.M.'s ability to communicate on the witness stand was impaired by defendant's presence. (See *ante*, at pp. 22–23; see also *Powell*, *supra*, 194 Cal.App.4th at p. 1284 [substantial evidence victim "would suffer great emotional distress if forced to testify" "to the point that she might not be able to provide a useful account of events for the jury"].)

We conclude the trial court's order allowing L.M. to testify via closed-circuit television did not constitute an abuse of discretion.[5, 6]

## II. Ineffective assistance of counsel

Defendant asserts defense counsel rendered ineffective assistance by (1) presenting "L.M.'s two recorded statements to Crain and Bernal," "[w]hich served only to corroborate her credibility" (boldface & capitalization omitted); and (2) failing to "impeach L.M. with her inconsistent testimony from the prior trial," i.e., her testimony that defendant had choked her "[w]ith his hands."

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–692.) "To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness . . . under prevailing professional norms." ' " ' [Citation.]" (*Mickel*, *supra*, at p. 198.) "We presume 'counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and accord great deference to counsel's tactical decisions. [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 674.) "To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's

---

[5] Defendant contends the trial court "misstated two portions of the factual record." (Boldface omitted.) First, "the court incorrectly paraphrased the testimony as showing that [defendant] would only occasionally watch L.M. and 'was not a constant in her life.' " Second, "the court [incorrectly] recalled that L.M. responded 'I don't know' when shown photographs of [defendant]'s home." Assuming, arguendo, the court made such misstatements, they have no bearing on our conclusion.

[6] Having examined the merits of the argument, we need not address (1) the Attorney General's claim of forfeiture; or (2) defendant's claim of ineffective assistance of counsel, which is premised on a finding of forfeiture.

deficient performance, the outcome of the proceeding would have been different."

(*Mickel*, *supra*, at p. 198.)

The record before us demonstrates defense counsel strategically elected to have the jury watch the video footage of the January 1, 2021 law enforcement interview and the January 16, 2021 MDIC interview. In his summation, he argued:

> "I'm not saying – I'm not saying that [L.M.] is not telling the truth about something that happened to her. I'm just not as convinced as the Prosecution is that it was my client. And I – I'm not making up the names 'Papa' and 'Frank.' I'm trying to make sense of why those are things that the child said during the course of this investigation. [¶] . . . [¶]

> "So specific things that I'm concerned about in the state of the evidence that you – that you have heard. In the first recorded interview that took place on January 1st of 2021, . . . with Officer Crain, [L.M.]'s mother who you heard testimony from, I have to comment on a couple things that – that I saw in that video that I just think are odd that don't – don't fit with the situation.

> "Officer Crain is asking [L.M.] a few questions and [K.M.] prompts [L.M.] to respond. And then [K.M.]'s body language is such that she's sitting sideways facing [L.M.], and she has her right hand – if you watch it again, I didn't notice it the first time that I saw it but after watching it multiple times it's obvious almost the entire time she's sitting with her right hand covering the front of her mouth, you can't see her mouth. You don't know saying if she's saying something 'quiet' or saying 'uh-huh' or anything like that.

> "So I don't have any additional evidence other than that observation, but I think that that goes to the instruction that you have regarding the different things that you can consider in evaluating witness credibility. I don't want to believe that [K.M.] – and I'm not even necessarily suggesting that [K.M.] planted the idea in [L.M.]'s mind of being abused, I'm not even suggesting that she was – was pressuring [L.M.] in any way to – that she was consciously selecting somebody that she didn't believe was the actual perpetrator. I'm just saying that – that she may have identified Patrick without the appropriate level of investigation or other evidence to actually support that. That may have been a conclusion that she jumped to and then it just kind of took hold in the course of the investigation, and I'll explain more about – about how I think that might have occurred. An assumption

that [K.M.] made about who the perpetrator was.  That I think does not prove this case beyond a reasonable doubt.

"In the second recorded interview on January 16th, 2021, with the child forensic interview Ms. S[.] Bernal, there's a lot that's important I think in that – in that interview, but I'm going to focus on four things.

"In the beginning – toward the beginning Ms. Bernal is still in the process of establishing a rapport with the child.  There's a point where she says 'okay.  All right.  Um, and so now I just want to get to know you a little bit better.  Tell me something that you like to do.'  The next thing that happens is [L.M.] says 'say I have like, um, like two parents but the bad one is Patrick.  He just puts his private part in my mouth, and he – and he's – and he's big.'  She says that whole complete sentence.  After – before Ms. Bernal asks her any questions about abuse or anything like that, it's in the beginning where she's building rapport.  'Tell me something that you like to do' the interviewer says and that's [L.M.]'s response.  That's strange.  That is strange to me.

"We know from Dr. Washington's testimony that a process that is incremental, spread out more in time, is what fits the evidence better.  That that is not inconsistent.  A process of reporting in smaller increments over time and testing how things go, that's the type of report that's not inconsistent with actual known victims of child sexual abuse.[7]

"When you listen closely to every other answer that [L.M.] gives during that interview with the child forensic examiner, there is no other time no other time where [L.M.] uses the name 'Patrick' or even 'Papa' together with a description of the abuse.  There's no other time that that happens.  Only one time does she use – does she use my client's name.  She says 'um, say I have like – um, like two parents, but the bad one is – is Patrick.  He just puts my (sic) private parts in my mouth.'

"Later Ms. Bernal in an effort to get more details about the abuse says 'tell me how did he choke you.'  The very next thing that [L.M.] says

---

[7] On cross-examination, defense counsel asked Dr. Washington to clarify whether "it's normal, or at least more normal compared to everything that's known about kids who are known victims of sex abuse for the disclosures to be incremental," i.e., "broken up into pieces over time."  (Boldface omitted.)  Dr. Washington answered:

"We commonly see that children use this process of incremental disclosures when they share something and then they may continue to share more details over time if they receive support through that process."

after that, tell me how did he choke you. [L.M.] says 'Frank is just a bad guy.' Frank is just a bad guy. She doesn't say anything about Patrick.

"Later in the interview Ms. Bernal is trying to get a description of more than one event because [L.M.] said that it happened more than one time. She's asking [L.M.] about – [L.M.] gives some information about some people in the home being nice or mean and Ms. Bernal asks 'who else was mean? Who else was mean?' [L.M.] says 'the boy I already said is mean.' The boy I already said. There's no other – there's no other boys that she's talked about during the interview. She said Patrick is the bad parent and she said Frank is just a bad guy.

"And as a child do you sometimes refer to adult men and women as boys and girls? I think so. I think that she's referring to the boy I already said is mean as being Frank. I think – I think that this is – this is a sad case of people jumping to conclusions and not listening closely enough to what the child is actually trying to tell you. The child said 'Frank is just a bad guy.' 'The boy I already said is mean.' She only says Patrick once in this prepackaged statement at the prepackaged that's not responsive to any question that Ms. Bernal asks.

"I also think it's odd that she says – that she says in that packaged statement 'say I have like, um, like two parents.' Wouldn't you just say I have two parents? Not 'say I have.' It's almost like someone else is telling her 'say you have two parents, but one is the bad one.'

"There are also several times [L.M.] is I feel like trying to be understood. She says 'that's the whole question.' She says that several times 'that's the whole question.' I think that she's confusing the word 'question' with 'answer.' That's my interpretation because in the context it seems like she's trying to say that's all I have to say about that. There isn't any more detail, you keep pressing me for more detail, that's the whole answer. But instead she says 'that's the whole question.' From the context that's how it seems to me.

"I don't know why there isn't other evidence about who Frank is, or why there isn't evidence of a further investigation that was done with a person named Frank. All I know is [L.M.] said that in the interview and that my client says he has a father named Frank who was around the child at certain times. There's no evidence that contradicts my client's testimony. . . . I think he testified credibly."

Defense counsel relied on the foregoing video footage to buttress various arguments impugning the adequacy of the criminal investigation and the trustworthiness of L.M. and

K.M. We "will not second-guess trial counsel's reasonable tactical decisions." (*People v. Kelly* (1992) 1 Cal.4th 495, 520.)

Conversely, the record does not specify why defense counsel did not impeach L.M. with her initial trial testimony suggesting defendant choked her with his hands only. "Under [such] circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Mickel*, *supra*, 2 Cal.5th at p. 198.) "If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) Here, defense counsel was never asked to provide a satisfactory explanation. Nor can we conclude any such explanation is nonexistent. " 'The failure to impeach a witness . . . [is a] matter[] which usually involve[s] tactical decisions on counsel's part and seldom establish[es] a counsel's incompetence. . . . " 'In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel. . . .' " ' [Citation.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1140.)

We reject defendant's claims of ineffective assistance of counsel.

## III. Cumulative error

"[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) "A claim of cumulative error is in essence a due process claim . . . ." (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) " 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*Ibid.*) "[T]he reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have

39.

reached a result more favorable to [the] defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

Because we have concluded there were no errors, defendant's claim of cumulative error fails. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1129; *People v. Heard* (2003) 31 Cal.4th 946, 982.)

## IV.     Ex parte application for preauthorization of expert and investigator fees

On May 3, 2024, defendant moved "to file [an] ex parte application for preauthorization of expert and investigator fees under seal." (Boldface & capitalization omitted.) On May 8, 2024, we issued an order granting this request. The same day, defendant filed an "**EX PARTE APPLICATION FOR PREAUTHORIZATION OF EXPERT AND INVESTIGATOR FEES**." On May 24, 2024, we issued an order deferring a ruling thereon pending consideration of the appeal on its merits. Having considered the appeal on its merits, we now address the ex parte application.

Defendant asks us for "expert and investigation fees" "in an effort to provide adequate representation and explore potentially serious issues in the case, while also preserving state resources." He cites *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307 and *In re Ketchel* (1968) 68 Cal.2d 397 as supporting authority. Neither case suggests an appellate court—as opposed to a trial court—is authorized to consider such requests in the first instance. (See *Corenevsky v. Superior Court*, *supra*, at pp. 312, 318–323 [concerning propriety of trial court's orders regarding ancillary defense services]; *In re Ketchel*, *supra*, at p. 398 ["narrow issue" before high court was whether to "affirm the trial court's order to the warden of the penitentiary to permit the examination of defendant by a psychiatrist selected by that counsel"].) We therefore deny the application.

**DISPOSITION**

The judgment is affirmed.


                                                    DETJEN, Acting P. J.

WE CONCUR:


MEEHAN, J.


FAIN, J.*

---

      * Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

41.